FILED'09 DEC 14 1451USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

TY DAUL and RAIMUND GRUBE,                                          CV 08-524-AC

                              Plaintiffs,                           OPINION AND ORDER

              v.

PPM ENERGY, INC., now known as
IBERDROLA RENEWABLES, INC., and
the SEVERANCE ENHANCEMENTS FOR
KEY PPM EMPLOYEES PLAN,

                              Defendants.

_____

ACOSTA, Magistrate Judge:

*Introduction*

        Plaintiffs Ty Daul and Raimund Grube (collectively "Plaintiffs") filed this action against their

former employer PPM Energy, Inc., now known as Iberdrola Renewables, Inc., ("PPM") and the

Page 1 - OPINION AND ORDER                                          {SSM}

Change in Control Severance Enhancements for Key PPM Employees Plan (the "Plan") (collectively "Defendants") in state court. Plaintiffs allege that PPM breached the Special Severance Protection Agreement (the "Agreement") entered into by the parties on April 16, 2007, by not paying them severance pay and benefits they were allegedly entitled to under the Agreement when they resigned. Defendants removed the action to this court on May 1, 2008, on the basis that the Agreement is an employee benefit plan under the federal Employment Retirement Income Security Act (29 U.S.C. §§ 1001 *et seq.* (2006) ("ERISA"), and thus, that federal law preempts Plaintiffs' breach of contract claim. Presently before the court are the parties' cross-motions for partial summary judgment regarding whether there was a "Material Alteration in Compensation" due to changes in the long-term incentive plan. For the reasons set forth below, this court grants Defendants' motion and denies Plaintiffs' motion.

## Factual Background

Plaintiffs are former high-level employees of PPM. (Daul Decl. ¶ 2; Grube Decl. ¶ 2.)[1] Daul was vice-president of business development, and Grube was managing director of business development. (*Id.*) In late April 2007, Scottish Power ("Scottish Power"), the parent corporation of PPM, was purchased by Iberdrola ("Iberdrola"). (*Id.* ¶ 3.) During the transition, PPM offered the Agreement (referred to as "special severance protections") to a "very few select group of individuals," in order to "eliminate concerns" they may have had about any negative financial impact due to an adverse change in their role or compensation structure for one year following the purchase of Scottish Power. (*Id.* Ex. 1 at 1; Hudgens Decl. ¶ 16.) On April 16, 2007, both Daul and Grube

---

[1] Grube and Daul have submitted virtually identical materials with their declarations. Unless otherwise required, citation will only be to the exhibits included with Daul's declaration.

voluntarily accepted the Agreement. (Daul Decl. ¶ 4, Ex. 1 at 2.)

A. The Agreement

The Agreement replaced the existing PPM Severance Plan (the "Existing Plan") for the employees who accepted the new plan. (*Id.* at 3.) The terms of the Agreement are clear that it is to expire one year after closing of the sale of Scottish Power. (Hudgens Decl. ¶ 19, Ex. 7 at 3.) Under the terms of the Agreement, Plaintiffs were entitled to severance benefits if they were involved in either: (1) a Qualifying Employer-Initiated Termination within 12 months following a Change in Control; or (2) a Qualifying Employee-Initiated Resignation that occurs no later than the 13th month following the Change in Control.[2] (Daul Decl. Ex. 1 at 3.) A Qualifying Employee-Initiated Resignation occurs when the employee voluntarily resigns due to a "Constructive Dismissal" or a "Material Alteration in Compensation." (*Id.*)

A "Constructive Dismissal" occurs when, "considering the employee's job responsibilities and scope of authority in the aggregate, the employee's role has unilaterally changed and has been materially diminished in a manner which effectively removes the employee from a position substantially comparable to the one the employee held immediately prior [to] the Change in Control." (*Id.*)

A "Material Alteration in Compensation" is:

> any of the following, provided that the change is not related to a change in business performance or Participant's performance or a restructuring of Participant's pay components so that the Participant's total direct compensation (base salary, bonus, and long-term incentive) is comparable:
>
> (1) The Participant's base pay is reduced by any amount, regardless of whether the

---

[2] Iberdrola's purchase of Scottish Power was a Change in Control for purposes of the Agreement. (Defs.' Resp. to Pl.'s Facts at 2.)

reduction is due to business or Participant's performance or a restructuring of pay components as set forth in 2(b) above;

(2) The Participant's earnings opportunity is adversely impacted by a change in the annual incentive structure, practices, or administrative guidelines, other than in the ordinary course or already planned prior to the transaction, that results in:

(a) a limit or cap on Participant's bonus opportunity

(b) a reduction in the Participant's opportunity to earn bonuses consistent with the Annual Incentive Plan dated FY 2006-2007 ("Annual Incentive Plan") and the Guidelines for Administration of the Annual Incentive Plan FY 2006-2007, which reflect the administrative practices in effect immediately prior to the Change in Control.  For this purpose, a qualifying change shall include, but not be limited to, a change from the current structure of recognizing business value and profit contribution in bonus allocations, a material change from the historical levels of Participant awards considering comparable business value and profit contributions and roles, or a material reduction in the proportion of profit and value sharing allocable to incentive funding.

(3) The Participant's earnings opportunity is adversely impacted by a material change in the scope of the Participant's responsibilities which limits the employee's contributions to key measures linked to reward opportunity in the Annual Incentive Plan.

(4) The Participant's earnings opportunity is adversely impacted by a change in the long-term incentive structure or administrative practices as described in the Value Appreciation Rights (VAR) Plan that results in:

(a) the elimination of the Participant's opportunity to earn comparable value appreciation for the growth of PPM;

(b) material changes to valuation methodology or the corporate structure used for valuation purposes, if any such changes has an adverse impact to the valuation of PPM for long-term incentive purposes.

In the event that a Participant voluntarily accepts a position that results in any of the above, this would not qualify as a "Material Alteration in Compensation" or a "Constructive Dismissal.["]

(*Id.* at 3-4.)

In the event of any Employee-Initiated Resignation, the Agreement requires the employee

to give the Company 60-days notice of their intent to resign.  (*Id.* at 4.)  If the Company cures the

Constructive Dismissal or Material Alteration in Compensation within 20 business days of receiving notice of the employee's intent to resign, the employee is not eligible for severance pay or benefits under the Agreement. (*Id.* at 4-5.)

Under the Agreement, severance pay will be based upon the greater of severance pay allowed under the Existing Plan or the employee's base pay and target bonus for twelve months. (*Id.* at 5.) The Agreement provides for the following severance benefits:

> (1) Company-subsidized health benefits for a period of six (6) months following the month in which the Participant terminates employment. The subsidy will be the same as the subsidy levels available to active employees at that time.
>
> (2) Executive level outplacement assistance for a period of twelve (12) months following termination from employment.
>
> (3) A prorated annual incentive award for the final performance period in which the Participant terminates employment. This prorated award will be determined on a discretionary basis by the Company, on the same basis as under the administrative guidelines and practices for the Annual Incentive Plan.
>
> (4) Accelerated vesting of any unvested Value Appreciation Rights (VARs). All vested VARs will be paid out to the Participant based on the next valuation following the participant's termination from employment.

(*Id.*)

## B. Long-Term Incentive Plans

In 2007, PPM eliminated its existing long-term incentive plan, known as the Value Appreciation Rights ("VAR") Plan, which had been in place since 2001. (*Id.* ¶ 10; Hudgens Decl. ¶ 3, Ex. 2 at 2.) The VAR Plan provided incentives to employees to achieve long-term performance results by granting VARs, which were analogous to company stock options. (Daul Decl. ¶ 8, Ex. 2 at 1.) VARs were granted annually, typically on October 1, based upon the September 30 valuation of the company. (Hudgens Decl. ¶ 3.) VARs vested annually in one-third increments beginning on

the one-year anniversary of the grant date. (*Id.*) Thus, one-third of the VARs granted to an employee as of October 1, 2004, became vested on October 1, 2005, another one-third on October 1, 2006, and the last third on October 1, 2007. (*Id.*) After the anniversary date, an employee could exercise vested VARs or hold them until the next anniversary date. (*Id.* ¶ 4.) If the employee decided to exercise their vested VARs, they were paid the difference between the grant or "strike" price and the value of the VARs based upon the most recent annual valuation. (*Id.*) Under the VAR Plan, 75% of the VARs granted in a given year had to be exercised within three months of the third anniversary of the grant. (*Id.*) The remaining 25% could be exercised between the third anniversary and three months following the fifth anniversary of the grant. (*Id.*)

PPM offered all participants in the VAR Plan the opportunity to participate in the Replacement Value Appreciation Rights ("RVAR") Plan in September 2007. (*Id.* ¶ 6, Ex. 2.) In order to resolve a controversy over the value and payment of VARs after the purchase of Scottish Power, the RVAR Plan required 100% participation. (*Id.* Ex. 2 at 1, Ex. 3 at 5.) The previous VAR Plan included change in control provisions which, if determined applicable, would have required immediate payment of all outstanding VARs that had previously been granted under the VAR Plan. (Supp. Daul Decl. ¶ 6; Hudgens Decl. Ex. 1 at 3-4.) PPM's position was that the change in control provision had not been triggered by the acquisition of Scottish Power. (Hudgens Decl. Ex. 3 at. 1.) Nonetheless, as a condition of enrollment in the RVAR Plan, participants were required to waive any claims they may have had under the VAR Plan's change in control provisions, thus fully resolving any controversy which may have existed as to whether the change in control provisions applied. (*Id.* at 5.)

The RVAR Plan had mandatory vesting and exercise dates for participants' existing VARs

Page 6 - OPINION AND ORDER                                              {SSM}

through October 2011. (Willey Decl. ¶ 13.) As of October 1, 2007, the value of VARs under the

VAR Plan was $30.80 per share. (Hudgens Decl. ¶ 7, Ex. 3 at 6, 9.) The RVAR Plan provided an

automatic increase in that value to $49 per share. (*Id.*) The RVAR Plan further provided that future

valuation of VARs after the October 2007 replacement price of $49 per share was based on a

guaranteed minimum 20% compounded annual growth rate ("CAGR") through October 1, 2011,

with a further 10% increase depending on the performance of Iberdrola stock. (*Id.* at 4, 7.) The

VARs that had been granted in prior years were to be valued and paid out pursuant to the RVAR

Plan, but no new VARs were authorized. (*Id.* Ex. 2 at 4.)

At the time PPM presented the RVAR Plan to its employees for consideration, PPM had not

yet decided how it would implement a new long-term incentive plan, but provided employees

information regarding the two alternatives under consideration. (*Id.* Ex. 3 at 17-23.) By PPM's own

admission, it took longer to formulate the new long-term incentive plan than expected. (*Id.* ¶ 13.)

PPM eventually adopted a new long-term incentive plan in July 2008, making it retroactive to

January 1, 2008. (*Id.*)

On September 23, 3007, Plaintiffs each signed an "Election to Participate" form (the

"Election Form"). (*Id.* Ex. 4, 5.) The form included the following language: "If I elect to participate

in the RVAR Plan, the RVAR Plan is a replacement for my prior rights under all of the VAR Plans."

(*Id.*) Plaintiffs added the following statement at the bottom of their forms:

> This election to participate is executed based on the understanding that PPM and
> [Plaintiff] agree that by electing to participate in the [RVAR] Plan, [Plaintiff] is
> not waiving any rights under the [Agreement] entered into by PPM and [Plaintiff] on
> April 16, 2007 and [Plaintiff] is not "voluntarily accept[ing] a position" as that
> language is used in the [Agreement].

(*Id.*) PPM accepted the modified forms. (Friel Decl. Ex. 2, p. 1.) All 463 VAR Plan participants

Page 7 - OPINION AND ORDER                                              {SSM}

elected to participate in the RVAR Plan. (Hudgens Decl. ¶ 12.) In October 2007, PPM adopted the RVAR Plan. (*Id.* ¶¶ 6, 11-12, Ex 2, 4-5.)

C. Plaintiffs' Total Direct Compensation

According to the Agreement, Plaintiffs' total direct compensation was made up of base pay, bonus, and long-term incentives. (Daul Decl. Ex. 1 at 3.)

1. Daul's Total Direct Compensation

From April 26, 2006, to April 25, 2007, Daul's earnings from his base salary were $196,289. (Willey Decl. ¶ 3.). From April 26, 2007, to April 25, 2008, his earnings from his base salary would have been $221,450 if he had not resigned in January 2008. (*Id.* Ex. 2.)

Daul was a participant in PPM's Annual Incentive Plan ("AIP"), which was a performance bonus plan. (Hudgens Decl. Ex. 1 at 1.) Under the AIP, Net Present Value ("NPV") awards were made to participants on a discretionary basis, based upon various factors including individual performance, business unit performance, and net present value generation during the fiscal year, which ended on March 31. (*Id.* ¶ 5.) NPV awards were generally spread out over a three-year period, with the first payment typically made in June following the end of the fiscal year for which the award was earned. (*Id.* ¶ 6.) If an employee voluntarily resigned before payment was made, all remaining deferred payments were forfeited. (*Id.*) In June 2007, Daul received an NPV award in the amount of $1,200,000, of which $400,000 was paid to him. (Willey Decl. ¶ 3, Ex. 2.) The remaining deferred payment of $800,000 was scheduled to be paid to him in two equal annual installments, beginning June 2008. (*Id.* ¶ 7.) Because Daul resigned before the end of the 2007-2008 fiscal year, no NPV award was made to him in 2008. (*Id.* ¶ 8.)

As of October 1, 2006, Daul owned 13,050 VAR 4 units,[3] each of which had a strike price of $15. (*Id.* ¶ 12.) He also owned 3,500 VAR 5 units, which had a strike price of $18.70. (*Id.*) On October 1, 2006, he was granted 6,290 VAR 6 units, at which time the strike price was $24.70. (*Id.*) As of October 1, 2007, Daul's VARs had a floor value of $1,014,311, based upon the minimum 20% CAGR and the mandatory Exercise Dates set forth in the RVAR Plan. (*Id.* ¶ 14.)

2. Grube's Total Direct Compensation

From April 26, 2006, to April 25, 2007, Grube's earnings from his base salary were $175,350. (*Id.* ¶ 4.) From April 26, 2007, to April 25, 2008, his earnings from his base salary would have been $186,748 if he had not resigned in January 2008. (*Id.*)

Grube was also a participant in the AIP bonus program, and was awarded an NPV award of $625,000 in June 2007. (*Id.* ¶ 9, Ex. 3.) Of that amount, $208,333 was paid to him in June 2007, with the remaining deferred payment of $416,667 scheduled to be paid in two equal annual installments, beginning June 2008. (*Id.* ¶ 9.) Because Grube resigned before the end of the 2007-2008 fiscal year, no NPV award was made to him in 2008. (*Id.* ¶ 10.)

As of October 1, 2006, Grube owned 15,000 VAR 4 units, each of which had a strike price of $15. (*Id.* ¶ 16.) He also owned 3,500 VAR 5 units, which had a strike price of $18.70. (*Id.*) On October 1, 2006, he was granted 4,720 VAR 6 units, at which time the strike price was $24.70. (*Id.*) As of October 1, 2007, Grube's VARs had a floor value of $993,059, based upon the minimum 20% CAGR and the mandatory Exercise Dates set forth in the RVAR Plan. (*Id.* ¶ 18.)

---

[3] VAR 4 units refer to VARs granted in October 2004. VAR 5 units are those granted in October 2005, and VAR 6 units are those granted in October 2006.

D. Employee-Initiated Resignation

Plaintiffs advised PPM of their intent to invoke Employee-Initiated Resignations on November 15, 2007. (Daul Decl. ¶ 15, Ex. 16; Hudgens Decl. ¶ 21.) Plaintiffs informed PPM that they felt the changes to the VAR Plan adversely impacted their earning and bonus opportunities, and therefore, qualified as a Material Alteration in Compensation under the terms of the Agreement. (Daul Decl. Ex. 16 at 1-2.) Plaintiffs also claimed that their job responsibilities and scope of work were substantially changed as a result of organizational restructuring, impacting their ability to contribute to key measures linked to reward opportunity under the Annual Incentive Program. (*Id.* at 2-3.)

On December 5, 2007, Linda Wah, PPM's Vice President of Human Resources, responded to Plaintiffs by email and indicated that she disagreed with their assertions that a Constructive Dismissal or Material Alteration in Compensation had occurred, and made them eligible for severance benefits under the Agreement. (Hudgens Decl. Ex. 10 at 1, 4.) Ms. Wah addressed each of the Plaintiffs' claims and explained why she did not agree with them. (*Id.* at 1-6.) After additional correspondence, on December 20, 2007, Ms. Wah emailed Plaintiffs a summary outlining PPM's proposal, in response to Plaintiffs' proposal. (Rosborough Decl. Ex. 2.) The proposal included bonuses and other amendments to Plaintiffs' existing compensation packages if they would commit to continuing their employment through December 31, 2008, at a minimum. (*Id.*)

The parties could not resolve their disagreement, and Plaintiffs' resignations became effective on January 15, 2008. (Daul Decl. ¶ 15.) PPM does not recognize Plaintiffs' resignations as Qualifying Employee-Initiated Resignations under the terms of the Agreement, and it has refused to pay Plaintiffs the severance pay and benefits provided for in the Agreement.

*Standards*

## A. Summary Judgment

Summary judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Id.*

## B. Standard of Review

ERISA provides a federal cause of action to recover benefits due under the terms of a benefit plan. 29 U.S.C. § 1132(a)(1)(B). Absent contrary language in the plan, the denial of ERISA benefits is reviewed under a *de novo* standard. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan unambiguously provides the administrator authority to determine eligibility for benefits or to construe the terms of the plan, the standard of review is altered from the default *de novo* standard to the more lenient abuse of discretion standard. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). ERISA is designed to promote good faith bilateral exchange of information on the merits of claims between the administrator and the claimant. *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1107 (9th Cir. 2003). "When a decision by an administrator utterly fails to follow applicable procedures, the administrator is not, in fact, exercising discretionary powers under the plan, and its decision should be subject to *de novo* review." *Abatie*, 458 F.3d at 959. *De novo* review is appropriate "when an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts

in utter disregard of the underlying purposes of the plan." *Id.* at 971. On August 14, 2009, this court

issued an Opinion and Order (#59) in which it concluded that the applicable standard for reviewing

PPM's denial of Plaintiffs' benefits is *de novo* because PPM's procedural violations were "so

flagrant as to alter the substantive relationship between Defendants and Plaintiffs, thereby depriving

Plaintiffs of the opportunity to exercise their right to an appeal mandated under ERISA and causing

substantive harm." 2009 WL 2496333 *7.

Where "*de novo* review applies . . . [t]he court simply proceeds to evaluate whether the plan

administrator correctly or incorrectly denied benefits." *Abatie.*, 458 F.3d at 963. The plaintiff carries

the burden to prove by a preponderance of the evidence that he was entitled to benefits under the

meaning of the plan. *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F.Supp.2d 1222, 1232

(N.D. Cal. 2003) (citing *Juliano v. Health Maint. Org. of New Jersey, Inc.*, 221 F.3d 279, 287-88

(2nd Cir. 2000)); *see also Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir.

1998) ("A plaintiff suing under [29 U.S.C. § 1132 (a)(1)(B)] bears the burden of proving his

entitlement to contractual benefits.") (citing *Farley v. Benefit Trust Life Ins., Co.*, 979 F.2d 653, 658

(8th Cir. 1992)).

## C. Interpretation of Contractual Terms under ERISA

While ERISA provides a cause of action for the recovery of benefits, it "does not contain a

body of contract law to govern the interpretation and enforcement of employee benefit plans. Rather,

Congress intended that courts apply contract principles derived from state law but be guided by the

policies expressed in ERISA and other federal labor laws." *Richardson v. Pension Plan of*

*Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997) (citation omitted). Accordingly, the terms

in an ERISA plan should be interpreted "in an ordinary and popular sense as would a person of

average intelligence and experience." *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir.),

*cert denied*, 537 U.S. 1067 (2002).

## Discussion

The Agreement is governed by ERISA, and this action was brought pursuant to 29 U.S.C.

§ 1132(a)(1)(B), which permits suits by beneficiaries to recover benefits. This dispute centers

around the proper interpretation of various provisions of the Agreement. In particular, the parties

disagree on whether the elimination of the VAR Plan constituted a "Material Alteration in

Compensation" under the terms of the Agreement.

Plaintiffs contend that they were entitled to invoke Employee-Initiated Resignations because

PPM's elimination of the VAR Plan and failure to replace it with another long-term incentive plan

was an adverse change to their earnings opportunity, and thus, constituted a Material Alteration in

Compensation as defined by the Agreement. Defendants argue that Plaintiffs were not entitled to

invoke Employee-Initiated Resignations and are therefore not entitled to the special severance

benefits provided for in the Agreement because the changes to the VAR Plan did not constitute a

Material Alteration in Compensation. In the alternative, Defendants contend that Plaintiffs did not

experience a Material Alteration in Compensation because their total compensation actually

increased. The Agreement defines a Material Alteration in Compensation in relevant part as follows:

> [A] 'Material Alteration in Compensation' is any of the following, provided that the change is not related to a change in business performance or Participant's performance or a restructuring of Participant's pay components so that the Participant's total direct compensation (base salary, bonus, and long-term incentive) is comparable:
>
> * * * *
>
> (4) The Participant's earnings opportunity is adversely impacted by a change in the long-term incentive structure or administrative practices as described in the Value Appreciation Rights (VAR) Plan that results in:

(a) the elimination of the Participant's opportunity to earn comparable value appreciation for the growth of PPM;

(b) material changes to valuation methodology or the corporate structure used for valuation purposes, if any such changes has an adverse impact to the valuation of PPM for long-term incentive purposes.

(Daul Decl. Ex. 1 at 3-4.)

A. Changes relating to Long-Term Incentive Plan

The parties' arguments focus primarily upon the impact of the changes made to the VAR Plan. The parties disagree as to who eliminated the VAR Plan, whether the doctrines of waiver and estoppel operate to bar Plaintiffs' claims for severance based upon the elimination of the VAR Plan, and whether the RVAR Plan eliminated Plaintiffs' opportunity to earn comparable value for the growth of PPM.

1. Elimination of Rights under VAR Plan

The first of the parties' arguments focuses upon whether Plaintiffs voluntarily eliminated their rights under the VAR Plan when they signed the Election Form enrolling in the RVAR Plan. Plaintiffs assert that PPM's decision not to grant employees any more VARs, not Plaintiffs' enrollment in the RVAR Plan, eliminated their rights under the VAR Plan. According to Plaintiffs, PPM made clear to employees that it no longer would grant new VARs, thereby repudiating its obligations under the VAR Plan, prior to Plaintiffs' election to participate in the RVAR Plan.

A party repudiates a contract when there is a "positive, unconditional, distinct refusal to perform in the future." *Wilson v. Western Alliance Corp.*, 78 Or. App. 197, 200 (1986). As evidence that PPM repudiated its obligations under the VAR Plan, Plaintiffs point to the PowerPoint presentation given to employees explaining the RVAR Plan. (Hudgens Decl., Ex. 3.) Plaintiffs content that the following two statements affirmatively established that PPM had decided that it

Page 14 - OPINION AND ORDER                                    {SSM}

would not offer any VARs, regardless of whether employees elected to remain in the VAR Plan or enrolled in the RVAR Plan:

- [PPM] reserves the right to revoke offer if 100% participation is not achieved.

- If offer is revoked, the Company will evaluate what long-term incentive plan will be offered.

(*Id.* at 14.)  Plaintiffs also point out that the presentation did not mention what would happen to the VAR Plan if the RVAR Plan were not implemented, and PPM made no promises that any new VARs would be granted to employees if they elected to remain in the VAR Plan.

Even drawing every inference in their favor, Plaintiffs have not provided any evidence, other than their own assumptions, that PPM had decided that under no circumstances would it grant any new VARs, thereby repudiating its obligations under the VAR Plan.  While the RVAR Plan clearly indicates that no new VARs will be granted should participants enroll in that plan, the record does not support the position that no new VARs would be granted under the VAR Plan if participants had elected to remain in the VAR Plan.  To the contrary, the RVAR Plan presentation and materials specifically state that participants did not have to accept the RVAR Plan offer, but that "PPM is encouraging 100% participation to eliminate the challenge of managing multiple programs." (*Id.* at 16.) The materials further indicate that PPM would provide a new long-term incentive plan in lieu of new VARs, but at the time it presented employees with the RVAR Plan it had not yet decided what form those long-term incentives would be. (*Id.* at 5, 17-23.) Such evidence directly undermines Plaintiffs' position that PPM had refused to grant new VARs in the future. Rather, it indicates that PPM recognized that granting long-term incentives, such as VARs, was a critical component of the VAR Plan, and that since the RVAR Plan did not contain such a provision, PPM would need to provide a long-term incentive plan in the future if it hoped to persuade participants

{SSM}

to relinquish their rights under the VAR Plan.

The record establishes that PPM was presenting its employees with a choice, which they were free to accept or reject. If the participants had elected not to participate in the RVAR Plan, they would have continued under the terms of the VAR Plan and PPM would have had to re-evaluate whether it wanted to adopt the RVAR Plan with less than 100% participation, continue with the VAR Plan, or develop a different plan. Here, the evidence provided by Plaintiffs is insufficient to establish that PPM had made a positive, distinct refusal to grant VARs in the future. Accordingly, the record does not support a reasonable inference that PPM repudiated its obligations under the VAR Plan by eliminating Plaintiffs' rights under the VAR Plan prior to Plaintiffs' enrollment in the RVAR Plan.

The court next considers Defendants' claim that Plaintiffs voluntarily eliminated their rights under the VAR Plan when they elected to enroll in the RVAR Plan because the RVAR Plan was a substituted contract, which replaced all rights under the VAR Plan, including any right to issuance of new VARs. A substituted contract is "a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty." *Eagle Industries, Inc. v. Thompson*, 321 Or. 398, 411 (1995) (quoting Restatement (Second) of Contracts § 279). "The substituted contract discharges the original duty and breach of substituted contract by the obligor does not give the obligee a right to enforce the original duty." *Id.*

Here, the plain language of the Election Form indicates that, "the RVAR Plan is a replacement for my prior rights under all of the VAR Plans." (Hudgens Decl. Ex. 4, 5.) Plaintiffs signed their Election Forms with full knowledge that they were giving up all their rights under the VAR Plan, and that in its current form the RVAR Plan did not include a provision granting any new

Page 16 - OPINION AND ORDER                                            {SSM}

VARs, or any other long-term incentives. The RVAR Plan was devoid of any language discussing how new VARs would be granted. At the time PPM presented the RVAR Plan it had not yet decided how it would implement a new long-term incentive plan, and PPM had indicated that it was in the process of considering two alternatives for a long-term incentive plan. (*Id.* Ex. 3 at 17-23.) PPM acknowledged that it took longer to formulate the new long-term incentive plan than expected. (*Id.* ¶ 13.) Essentially, the RVAR Plan was presented as the first step in at least a two-step process for reformulating a complete long-term incentive plan. The RVAR Plan changed the method for valuation and payment of previously granted VARs, but failed to provide a framework for how employees could earn new long-term incentive grants. PPM eventually adopted a new long-term incentive plan in July 2008, making it retroactive to January 1, 2008. (*Id.* ¶ 13.)

Not only was the RVAR Plan a replacement of all prior rights under the VAR Plan, it provided a totally new revaluation formula for the prior VARs held by participants, and this formula created a greater guaranteed value than provided for under the VAR Plan. Essentially, the RVAR Plan provided for an award of entirely new compensation by using a new valuation formula for participants' existing VAR holdings. In November 2007, Daul exercised 9,788 VAR 4 shares at $34 per share, the net value under the RVAR Plan, and received $332,792 from PPM. (Daul Decl. Ex. 5, 14.) Had Daul exercised the shares at the same time but remained under the VAR Plan, he would have only received $154,650. (Willey Decl. ¶ 20.) Also in November 2007, Grube exercised 11,250 VAR 4 shares and received $382,500 from PPM. (Grube Decl. Ex. 5, 11.) Had Grube remained under the VAR Plan when he exercised those shares, he would have only received $177,750. (Willey Decl. ¶ 21.) The increased value received by Plaintiffs in November 2007 for their VAR 4 shares would not have existed but for the new agreement.

The record is clear that as of September 23, 2007, when Plaintiffs signed their Election Forms, PPM had not yet determined what form the new long-term incentive plan would take and that Plaintiffs nonetheless elected to participate in the RVAR Plan. The fact that no new long-term incentive plan had been implemented by the time Plaintiffs gave notice of their intent to invoke Employee-Initiated Resignations on November 15, 2007, does not change that Plaintiffs knew the RVAR Plan did not contain a plan for granting long-term incentives when they elected to participate in it. In short, Plaintiffs eliminated their rights under the VAR Plan when they voluntarily elected to participate in the RVAR Plan, with full knowledge that doing so was a replacement of all of their rights under the VAR Plan, including any right to be awarded new VARs. Plaintiffs' voluntary elimination of their rights under the VAR Plan did not constitute a Material Alteration in Compensation.

### 2. Waiver and Estoppel

Defendants next contend that Plaintiffs' claims are barred under the doctrines of waiver and estoppel because by electing to participate in the RVAR Plan, Plaintiffs voluntarily relinquished all their rights under the VAR Plan and cannot now rely upon the VAR Plan as a basis for their claim for severance benefits under the Agreement. Specifically, Defendants point to the Election Forms signed by Plaintiffs in which they expressly agreed to eliminate all of their rights under the VAR Plan and accept the RVAR Plan as "a replacement for my prior rights under all of the VAR Plans." (Hudgens Decl. Ex. 4, 5.) Such language constituted a waiver of all Plaintiffs' rights under the VAR Plan. As such, Plaintiffs should be estopped from relying upon the VAR Plan because they led PPM to believe that they had waived their rights under the VAR Plan when they agreed to participate in the RVAR Plan.

In response, Plaintiffs assert that they expressly conditioned their election to participate in the RVAR Plan on the understanding that they were not "waiving any rights under the [Agreement] and that they were not "'voluntarily accept[ing] a position' as that language is used in the [Agreement]." (*Id.*) Plaintiffs contend that this is significant because their claim for special severance benefits arises exclusively from the Agreement, not from the VAR Plan, as they are alleging that a Material Alteration in Compensation occurred as a result of PPM's failure to implement *any* long-term incentive plan. Further, PPM knew that the added language was intended to reserve their rights under the Agreement, and agreed to accept the modified election form. (Friel Decl. Ex. 2.)

"Waiver is the voluntary relinquishment of a known right. A party to a written contract may waive a provision of that contract by conduct or by oral representation." *Bennett v. Farmers Ins. Co. of Oregon*, 332 Or. 138, 156 (2001)(citation omitted). Here, Plaintiffs manifested their relinquishment in two ways. First, they relinquished all rights under the VAR Plan when they signed the Election Form. Second, they waived their rights under the VAR Plan by their conduct when they accepted the higher payments under the RVAR Plan for their VAR 4 shares. Thus, the record is clear that Plaintiffs waived their rights under the VAR Plan, including any right to receive new VARs, both by expressly agreeing to the waiver when they signed the Election Form, and by their conduct when they accepted the increased payments under the RVAR Plan.

Having found that Plaintiffs waived their rights under the VAR Plan, the court must next consider the significance of the modified Election Form. Initially, it is undisputed that Plaintiffs' waiver of rights under the VAR Plan did not constitute "voluntarily accept[ing] a position as is defined in the Agreement." The real question to resolve is whether this waiver may be construed as

waiving Plaintiffs' rights under the Agreement, to the extent that Plaintiffs' claim for severance benefits relates to the elimination of the VAR Plan. If so, then the other question to decide is whether Plaintiffs' express reservation of rights under the Agreement is sufficient to preserve their right to allege that a change in the VAR Plan constituted a Material Alteration in Compensation under the Agreement.

Plaintiffs argue that the RVAR Plan had nothing to do with Plaintiffs' rights to severance benefits under the Agreement. The court disagrees. The RVAR Plan changed a component of Plaintiffs' total direct compensation when it altered the method for valuing and paying already granted VARs, thereby creating a direct effect on the amount of money Plaintiffs received as part of their total compensation, and potentially leading to a Material Alteration in Compensation. While the court does not find that Plaintiffs waived their right to bring a severance benefit claim under the Agreement when they signed the RVAR Election Form, the court does find that Plaintiffs waived their right to bring a severance benefit claim that is based upon rights previously granted under the VAR Plan. This is because a general reservation of rights cannot prevail over a clear, unequivocal manifestation of contractual rights or responsibilities. *Soliz v. Jimenez*, 222 Or. App. 251, 259-260 (2008). In this case, the Election Form's waiver was clear and unequivocal; Plaintiffs were waiving all their rights under the VAR Plan. The additional language added by Plaintiffs served to generally reserve their rights under the Agreement but it is insufficient to overcome their unequivocal waiver of all rights under the VAR Plan.

Furthermore, the unequivocal waiver signed by Plaintiffs reasonably led PPM to believe that Plaintiffs had waived their rights under the VAR Plan, which resulted in PPM's reliance on that waiver by allowing Plaintiffs to take advantage of the financial incentives included in the RVAR

Plan. Accordingly, the doctrines of waiver and estoppel operate to bar Plaintiffs from relying upon the VAR Plan as the basis for their claim for severance benefits under the Agreement.

### 3. Opportunity to Earn Comparable Growth

In their claim for severance benefits under the Agreement, Plaintiffs assert that replacement of the VAR Plan with the RVAR Plan eliminated their opportunity to earn comparable value for the growth of PPM. In response, Defendants contend that the RVAR Plan provided a much greater earnings opportunity than the old VAR Plan because of an increase in value granted to existing VAR shares, a guaranteed 20% CAGR of VAR value, and a potential 10% increase based upon the performance of the public stock price for Iberdrola, which takes into account the Company's worldwide assets.

The Agreement defines a Material Alteration in Compensation to include the following situation:

> (4) The Participant's earnings opportunity is adversely impacted by a change in the long-term incentive structure or administrative practices as described in the Value Appreciation Rights (VAR) Plan that results in:
>
> (a) the elimination of the Participant's opportunity to earn comparable value appreciation for the growth of PPM;

(Daul Decl. Ex. 1 at 4.) The VAR Plan was PPM's only long-term incentive plan in place during Plaintiffs' employment. The parties agree that as of October 1, 2007, Daul's existing VARs had a floor value of $1,014, 311, and Grube's a floor value of $993,059, based upon the minimum $20 CAGR and the mandatory Exercise Dates set forth in the RVAR Plan. (Willey Decl. ¶¶ 14, 17.) Defendants offer that if Plaintiffs had elected to remain under the old VAR Plan, the estimated values of their VARs would have been $482,812 for Daul and $467,845 for Grube. (*Id.* ¶¶ 15, 18.) Defendants base their estimate upon the October 1, 2007 VAR valuation expectation of $30.80 gross

Page 21 - OPINION AND ORDER                                              {SSM}

value under the old VAR Plan, a 20% CAGR, and the assumption that Plaintiffs would not exercise their VARs until the latest date possible. (*Id.* ¶ 15.)

The VARs represented a significant amount of Plaintiffs' compensation, and were directly linked to contributions to the long-term growth of the company. It is undisputed that the RVAR Plan did not include a plan for granting new VARs or other long-term incentives, and that PPM did not adopt a new long-term incentive plan until July 2008, long after Plaintiffs' employment ended. Instead, the RVAR Plan simply changed the method for valuing, vesting, and exercising previously granted VARs.

The plain language of the Agreement indicates that such an elimination of the opportunity to earn comparable value appreciation for the growth of PPM would be a Material Alteration in Compensation so long as the participant's earnings opportunity is adversely impacted. Here, the RVAR Plan ensured that the participant's earnings opportunity would not be adversely impacted, by recalculating the payment structure of existing VARs so that their value was greater than participants would likely have received under the VAR Plan. With mandatory vesting and exercise schedules, PPM guaranteed that participants would continue to receive income from grants earned under the previous long-term incentive plan. Thus, while the RVAR Plan did not provide for earning of new long-term incentives, the value of the VARs was still tied to the growth of PPM: the ultimate valuation of the VARs was related to the performance of Iberdrola's stock, and PPM further ensured that participants' earning opportunities would not suffer by including a minimum guaranteed CAGR rate of 20%. Therefore, no Material Alteration in Compensation occurred because the RVAR Plan did not eliminate Plaintiffs' opportunity to earn comparable value for the growth of PPM.

B. Increase in Total Compensation

{SSM}

In the alternative, Defendants contend that they are entitled to partial summary judgment because, despite the changes to the VAR Plan, Plaintiffs did not experience a Material Alteration in Compensation because their total compensation increased. In response, Plaintiffs argue that they were deprived of a significant portion of their earnings opportunity due to the elimination of the VAR Plan and the failure to implement a comparable long-term incentive plan in the time prescribed by the Agreement.

The Agreement defines a Material Alteration in Compensation as "any of the following, provided that the change is not related to a . . . restructuring of Participant's pay components so that the Participant's total direct compensation (base salary, bonus, and long-term incentive) is comparable[.]" (Daul Decl. Ex. 1 at 3.) In other words, the above language expressly carves out an exception allowing for restructuring of pay components, so long as total direct compensation remains comparable. The court finds that this language requires purely monetary, "dollars and cents" analysis of whether compensation remained comparable, rather than analysis of whether the three pay components remained comparable. As discussed extensively above, the adoption of the RVAR Plan had a direct effect on the long-term incentive component of Plaintiffs' compensation structure. The critical question is whether despite this change, Plaintiffs' total compensation, as measured in monetary terms, actually increased.

Here, despite PPM's failure to immediately implement a new long-term incentive plan, Plaintiffs' total compensation increased. If Daul had not resigned, his total direct compensation for the one-year period following the purchase of Scottish Power would have been $2,471,231, which is $625,982 more than it was during the one-year period prior to the purchase. (Willey Decl. Ex. 2.) Similarly, had Grube not resigned, his total compensation would have been $1,845,377, which is

Page 23 - OPINION AND ORDER                                                    {SSM}

$610,637 more than it was the previous year.  (*Id.* Ex. 3.)  Accordingly, there was no Material

Alteration in Compensation due to restructuring of pay components.  Defendants are granted partial

summary judgment on this issue.

## *Conclusion*

For the reasons discussed above, Plaintiffs' motion for partial summary judgment (docket

# 60) is DENIED.  Defendants' motion for partial summary judgment (docket # 69) is GRANTED.

DATED this 14th day of December, 2009.

JOHN V. ACOSTA
United States Magistrate Judge