FILED

APR 1 5 2010

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

TY DAUL and RAIMUND GRUBE,

                    Plaintiffs,

     v.

PPM ENERGY, INC., now known as
IBERDROLA RENEWABLES, INC., and
the SEVERANCE ENHANCEMENTS FOR
KEY PPM EMPLOYEES PLAN,

                    Defendants.

Case No.: 08-CV-524-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Opinion*

      Plaintiffs Ty Daul and Raimund Grube (collectively "Plaintiffs") filed this action against their

former employer PPM Energy, Inc., now known as Iberdrola Renewables, Inc., ("PPM") and the

Change in Control Severance Enhancements for Key PPM Employees Plan (the "Plan") (collectively "Defendants") in state court. Plaintiffs allege that PPM breached the Special Severance Protection Agreement (the "Agreement") entered into by the parties on April 16, 2007, by not paying them severance pay and benefits they were allegedly entitled to under the Agreement when they resigned. Defendants removed the action to this court on May 1, 2008, on the basis that the Agreement is an employee benefit plan under the federal Employment Retirement Income Security Act (29 U.S.C. §§ 1001 *et seq*. (2006) ("ERISA"), and thus, that federal law preempts Plaintiffs' breach of contract claim.

Previously, this court addressed the parties' cross-motions for partial summary judgment on the issue of whether there was a "Material Alteration in Compensation" due to changes in the Value Appreciation Rights Plan ("VAR Plan"). In its Opinion and Order dated December 14, 2009 (the "Opinion"), this court found that: "Plaintiffs' voluntary elimination of their rights under the VAR Plan did not constitute a Material Alteration in Compensation"; "no Material Alteration in Compensation occurred because the RVAR Plan[1] did not eliminate Plaintiffs' opportunity to earn comparable value for the growth of PPM"; and "there was no Material Alteration in Compensation due to restructuring of pay components." (Opinion at 18, 22 and 24.) Consequently, this court granted Defendants' motion for partial summary judgment and dismissed Plaintiffs' claims based on the VAR Plan.

Presently before the court is Defendants' motion for partial summary judgment on Plaintiffs' claims based on a Material Alteration in Compensation under PPM's Annual Incentive Plan ("AIP").

---

[1]The RVAR Plan is identified as the Replacement Value Appreciation Plan offered to all VAR Plan participants in September 2007. (Opinion at 6.)

Defendants contend that the finding of this court that Plaintiffs' earning opportunities were not adversely impacted as set forth in the Opinion requires the dismissal of Plaintiffs' AIP-based claims. Alternatively, Defendants argue that Plaintiffs' counsel's statement at a status conference that the Opinion disposed of their AIP-based claims is a judicial admission and bars the continued litigation of these claims. Plaintiffs oppose the motion for partial summary judgment on the merits and, alternatively, ask that a ruling on the motion be delayed pending additional discovery pursuant to FED. R. CIV. P. 56(f).

The court finds that Plaintiffs' counsel's alleged oral statement at a nonreported status conference is not a judicial admission and that, in any event, a genuine issue of material fact exists with regard to whether the statement was made. Additionally, the court stands by its prior determinations that the term Material Alteration in Compensation requires a purely monetary, 'dollars and cents' analysis of whether compensation remained comparable, that Plaintiffs' total compensation, as measured in monetary terms, actually increased, and that there was no Material Alteration in Compensation due to restructuring of pay components. Based on these findings, Defendants' motion for summary judgment on Plaintiffs' AIP-based claims is granted and Plaintiffs' request for additional discovery is denied.

*Background*

Plaintiffs are former high-level employees of PPM. (Daul Decl. ¶ 2; Grube Decl. ¶ 2.)[2] PPM was in the renewable energy business, with wind energy as its primary focus. (Daul Decl. ¶ 3.) Daul was vice-president of business development in the Wind Group, and Grube was managing director

---

[2]Grube and Daul have submitted virtually identical materials with their declarations. Unless otherwise required, citation will only be to the exhibits included with Daul's declaration.

of business development for the same group. (Daul Decl. ¶ 2; Grube Decl. ¶ 2.) In late April 2007,

Scottish Power ("Scottish Power"), the parent corporation of PPM, was purchased by Iberdrola

("Iberdrola"). (Daul Decl. ¶ 3; Grube Decl. ¶ 3.)

During the transition, PPM offered the Agreement to a "very few select group of

individuals," in order to "eliminate concerns" they may have had about any negative financial impact

due to an adverse change in their role or compensation structure for one year following the purchase

of Scottish Power. (Daul Decl. Ex. 1 at 1.) On April 16, 2007, both Daul and Grube voluntarily

accepted the Agreement. (Daul Decl. ¶ 4, Grube Decl. ¶ 4.)

I. The Agreement

The Agreement was "in lieu of, not in addition to," the existing PPM Severance Plan (the

"Existing Plan") for the employees who accepted the new plan. (Daul Decl. Ex. 1 at 3.) The terms

of the Agreement expired one year after closing of the sale of Scottish Power. (Opinion at 3.) Under

the terms of the Agreement, Plaintiffs were entitled to severance benefits if they were involved in

either: (1) a Qualifying Employer-Initiated Termination within 12 months following a Change in

Control; or (2) a Qualifying Employee-Initiated Resignation that occurs no later than the 13th month

following the Change in Control.[3] (Daul Decl. Ex. 1 at 3.) A Qualifying Employee-Initiated

Resignation occurs when the employee voluntarily resigns due to a "Constructive Dismissal" or a

"Material Alteration in Compensation." (Daul Decl. Ex. 1 at 3.)

A "Constructive Dismissal" occurs when, "considering the employee's job responsibilities

and scope of authority in the aggregate, the employee's role has unilaterally changed and has been

---

[3]Iberdrola's purchase of Scottish Power was a Change in Control for purposes of the
Agreement.

materially diminished in a manner which effectively removes the employee from a position substantially comparable to the one the employee held immediately prior [to] the Change in Control." (Daul Decl. Ex. 1 at 3.)

A "Material Alteration in Compensation" is defined in section 2(b) of the Agreement as:

any of the following, provided that the change is not related to a change in business performance or Participant's performance or a restructuring of Participant's pay components so that the Participant's total direct compensation (base salary, bonus, and long-term incentive) is comparable:

(1) The Participant's base pay is reduced by any amount, regardless of whether the reduction is due to business or Participant's performance or a restructuring of pay components as set forth in 2(b) above;

(2) The Participant's earnings opportunity is adversely impacted by a change in the annual incentive structure, practices, or administrative guidelines, other than in the ordinary course or already planned prior to the transaction, that results in:

(a) a limit or cap on Participant's bonus opportunity

(b) a reduction in the Participant's opportunity to earn bonuses consistent with the Annual Incentive Plan dated FY 2006-2007 ("Annual Incentive Plan") and the Guidelines for Administration of the Annual Incentive Plan FY 2006-2007, which reflect the administrative practices in effect immediately prior to the Change in Control. For this purpose, a qualifying change shall include, but not be limited to, a change from the current structure of recognizing business value and profit contribution in bonus allocations, a material change from the historical levels of Participant awards considering comparable business value and profit contributions and roles, or a material reduction in the proportion of profit and value sharing allocable to incentive funding.

(3) The Participant's earnings opportunity is adversely impacted by a material change in the scope of the Participant's responsibilities which limits the employee's contributions to key measures linked to reward opportunity in the Annual Incentive Plan.

(4) The Participant's earnings opportunity is adversely impacted by a change in the long-term incentive structure or administrative practices as described in the Value Appreciation Rights (VAR) Plan that results in:

(a) the elimination of the Participant's opportunity to earn comparable value

appreciation for the growth of PPM;

(b) material changes to valuation methodology or the corporate structure used for valuation purposes, if any such changes has an adverse impact to the valuation of PPM for long-term incentive purposes.

In the event that a Participant voluntarily accepts a position that results in any of the above, this would not qualify as a "Material Alteration in Compensation" or a "Constructive Dismissal.["]

(Daul Decl. Ex. 1 at 3-4.)

In the event of any Employee-Initiated Resignation, the Agreement requires the employee to give the Company sixty-days' notice of their intent to resign. (Daul Decl. Ex. 1 at 4.) If the Company cures the Constructive Dismissal or Material Alteration in Compensation within 20 business days of receiving notice of the employee's intent to resign, the employee is not eligible for severance pay or benefits under the Agreement. (Daul Decl. Ex. 1 at 4-5.)

Under the Agreement, severance pay will be based upon the greater of severance pay allowed under the Existing Plan or the employee's base pay and target bonus for twelve months. (Daul Decl. Ex. 1 at 5.) The Agreement provides for the following severance benefits:

(1) Company-subsidized health benefits for a period of six (6) months following the month in which the Participant terminates employment. The subsidy will be the same as the subsidy levels available to active employees at that time.

(2) Executive level outplacement assistance for a period of twelve (12) months following termination from employment.

(3) A prorated annual incentive award for the final performance period in which the Participant terminates employment. This prorated award will be determined on a discretionary basis by the Company, on the same basis as under the administrative guidelines and practices for the Annual Incentive Plan.

(4) Accelerated vesting of any unvested Value Appreciation Rights (VARs). All vested VARs will be paid out to the Participant based on the next valuation following the participant's termination from employment.

(Daul Decl. Ex. 1 at 5.)

II. Long-Term Incentive Plan

In 2007, PPM eliminated the VAR Plan, its then existing long-term incentive plan, and replaced it with the RVAR Plan. (Opinion at 5-6.) Both plans provided incentives to employees to achieve long-term performance results by granting value appreciation rights, which were analogous to company stock options. (Opinion at 5-7.) In its prior Opinion, this court found that Plaintiffs did not experience a Material Alteration in Compensation under section 2(b)(4) as a result of the changes to the VAR Plan and dismissed Plaintiff's claims based on the VAR Plan.

III. Annual Incentive Plan

For fiscal year 2006-2007,[4] PPM had an AIP in place, supplemented by administrative guidelines approved on November 3, 2006 ("Guidelines"), and was funded by approximately 15% of PPM's Earnings Before Interest and Taxes ("EBIT"). (Willey Decl. Ex. 1 at 1.) The majority of PPM's employees, including Plaintiffs, were entitled to participate in the AIP and to receive distributions from the funded pool. (Willey Decl. Ex. 1 at 1.) Awards were made to participants on a discretionary basis, based upon various factors including a participant's eligible earnings, business unit performance, Net Present Value ("NPV") generation, and individual/team performance against goals. (Willey Decl. Ex. 1 at 3.) NPV awards were generally spread out over a three-year period, with the first payment typically made in June following the end of the fiscal year for which the award was earned. (Willey Decl. Ex. 1 at 7.) If an employee voluntarily resigned before payment was made, all remaining deferred payments were forfeited. (Willey Decl. Ex. 1 at 2.) The

---

[4]PPM's fiscal year ran from April 1 through March 31.

AIP continued into fiscal year 2008-2009 and was in effect when Plaintiffs gave notice of a Qualifying Employee-Initiated Resignation on November 15, 2007. (Hudgens[5] Decl. Ex. 10 at 2-3; Hudgens Supp. Decl. ¶ 4.) No changes were made to the AIP or the Guidelines and no new groups, such as Iberdrola employees, were placed under the AIP through April 1, 2009. (Hudgens Decl. Ex. 10 at 2-3, Hudgens Supp. Decl. ¶ ¶ 4-5.)

IV.  Employee-Initiated Resignation

Plaintiffs advised PPM of their intent to invoke Qualified Employee-Initiated Resignations on November 15, 2007. (Daul Decl. ¶ 18, Ex. 2; Grube Decl. ¶ 18.) Plaintiffs informed PPM that they felt the changes to the VAR Plan and AIP adversely impacted their earning and bonus opportunities, and therefore, qualified as a Material Alteration in Compensation under the terms of the Agreement. (Daul Decl. Ex. 2 at 2.) Plaintiffs also claimed that their job responsibilities and scope of work were substantially changed as a result of organizational restructuring, impacting their ability to contribute to key measures linked to reward opportunity under the AIP. (Daul Decl. Ex. 2 at 2-3.)

On December 5, 2007, Linda Wah, PPM's Vice President of Human Resources, responded to Plaintiffs by email and indicated that she disagreed with their assertions that a Constructive Dismissal or Material Alteration in Compensation had occurred and made them eligible for severance benefits under the Agreement. (Hudgens Decl. Ex. 10 at 1, 4.) Wah addressed each of the Plaintiffs' claims and explained why she did not agree with them. (Hudgens Decl. Ex. 10 at 1-6.) The parties could not resolve their disagreement, and Plaintiffs' resignations became effective on January 15, 2008. (Opinion at 10.) PPM does not recognize Plaintiffs' resignations as Qualifying

---

[5]Terry Hudgens was CEO and President of PPM through November 1, 2008.

Employee-Initiated Resignations under the terms of the Agreement and it has refused to pay Plaintiffs the severance pay and benefits provided for in the Agreement.

V.  Plaintiffs' Total Direct Compensation

According to the Agreement, Plaintiffs' total direct compensation was made up of base pay, bonus, and long-term incentives.  (Daul Decl. Ex. 1 at 3.)

*A. Daul's Total Direct Compensation*

1.  Before the Change in Control

From April 26, 2006, to April 25, 2007, Daul's earnings from his base salary were $196,289. (Willey Decl. ¶ 3, Ex. 2.)  The estimated overall value of Daul's VAR units for the same period was $448,960, based upon a 20% compounded annual growth rate ("CAGR") and an assumption that he would not exercise his VAR units until the latest date possible.  (Willey Decl. ¶ 12, Ex. 2.)  In June 2007, Daul received an NPV award under the AIP in the amount of $1,200,000, of which $400,000 was paid to him.  (Willey Decl. ¶ 7, Ex. 2.)  The remaining deferred payment of $800,000 was scheduled to be paid to him in two equal annual installments, beginning June 2008.  (Willey Decl. ¶ 7.)  Accordingly, Daul's total compensation from April 26, 2006, to April 25, 2007, was $1,845,249.  (Willey Decl. Ex. 2.)

2.  After the Change in Control

From April 26, 2007 to April 25, 2008, Daul's earnings from his base salary would have been $221,450 if he had not resigned in January 2008.  (Willey Decl. ¶ 3, Ex. 2.)  As of October 1, 2007, Daul's VAR units had a floor value of $1,014,311, based upon the minimum 20% CAGR and the mandatory exercise dates set forth in the RVAR Plan.  (Willey Decl. ¶ 14, Ex. 2.)  Because Daul resigned before the end of the 2007-2008 fiscal year, no NPV award was made to him in 2008.

(Willey Decl. ¶ 8.) However, if he had not resigned, a reasonable estimate of Daul's NPV award for June 2008, using criteria and factors consistent with those used in prior years, would have been $1,235,470. (Willey Decl. ¶ 8, Ex. 2.) Accordingly, Daul's total compensation from April 26, 2007, to April 25, 2008, had he not resigned in January 2008, would have been $2,471,231. (Willey Decl. Ex. 2.)

### B. Grube's Total Direct Compensation

#### 1. Before the Change in Control

From April 26, 2006, to April 25, 2007, Grube's earnings from his base salary were $175,350. (Willey Decl. ¶ 4, Ex. 3.) The estimated overall value of Grube's VAR units for the same period was $434,390, based upon a 20% CAGR and an assumption that he would not exercise his VAR units until the latest date possible. (Willey Decl. ¶ 16, Ex. 3.) In June 2007, Grube received an NPV award under the AIP in the amount of $625,000, of which $208,333 was paid to him. (Willey Decl. ¶ 9, Ex. 3.) The remaining deferred payment of $416,667 was scheduled to be paid to him in two equal annual installments, beginning June 2008. (Willey Decl. ¶ 9.) Accordingly, Grube's total compensation from April 26, 2006, to April 25, 2007, was $1,234,740. (Willey Decl. Ex. 3.)

#### 2. After the Change in Control

From April 26, 2007 to April 25, 2008, Grube's earnings from his base salary would have been $221,450 if he had not resigned in January 2008. (Willey Decl. ¶ 4, Ex. 3.) As of October 1, 2007, Grube's VAR units had a floor value of $993,059, based upon the minimum 20% CAGR and the mandatory exercise dates set forth in the RVAR Plan. (Willey Decl. ¶ 17, Ex. 3.) Because Grube resigned before the end of the 2007-2008 fiscal year, no NPV award was made to him in 2008.

PAGE 10 - OPINION AND ORDER                                                    {SIB}

(Willey Decl. ¶ 10.)  However, if he had not resigned, a reasonable estimate of Grube's NPV award

for June 2008, using criteria and factors consistent with those used in prior years, would have been

$665,570.  (Willey Decl. ¶ 10, Ex. 3.)  Accordingly, Grube's total compensation from April 26,

2007, to April 25, 2008, had he not resigned in January 2008, would have been $1,845,377.  (Willey

Decl. Ex. 3.)

## VI. Opinion

In the Opinion, the court addressed the parties' arguments based on the elimination of the

VAR Plan.  Plaintiffs argued that they were entitled to invoke Qualified Employee-Initiated

Resignations because PPM's elimination of the VAR Plan, and failure to replace it with another

long-term incentive plan, was an adverse change to their earnings opportunity, and thus, constituted

a Material Alteration in Compensation as defined by the Agreement.  Defendants asserted, in part,

that Plaintiffs did not experience a Material Alteration in Compensation because their total

compensation actually increased and, therefore, were not entitled to the special severance benefits

provided for in the Agreement.  On this issue, this court stated that:

> The Agreement defines a Material Alteration in Compensation as "any of the
> following, provided that the change is not related to a . . . restructuring of
> Participant's pay components so that the Participant's total direct compensation (base
> salary, bonus, and long-term incentive) is comparable[.]" (Daul Decl. Ex. 1 at 3.)
> In other words, the above language expressly carves out an exception allowing for
> restructuring of pay components, so long as total direct compensation remains
> comparable.  The court finds that this language requires purely monetary, "dollars
> and cents" analysis of whether compensation remained comparable, rather than
> analysis of whether the three pay components remained comparable.  As discussed
> extensively above, the adoption of the RVAR Plan had a direct effect on the long-
> term incentive component of Plaintiffs' compensation structure. The critical question
> is whether despite this change, Plaintiffs' total compensation, as measured in
> monetary terms, actually increased.
>
> Here, despite PPM's failure to immediately implement a new long-term

incentive plan, Plaintiffs' total compensation increased. If Daul had not resigned, his total direct compensation for the one-year period following the purchase of Scottish Power would have been $2,471,231, which is $625,982 more than it was during the one-year period prior to the purchase. (Willey Decl. Ex. 2.) Similarly, had Grube not resigned, his total compensation would have been $1,845,377, which is $610,637 more than it was the previous year. (*Id.* Ex. 3.) Accordingly, there was no Material Alteration in Compensation due to restructuring of pay components.

(Opinion at 23-24.)

*Standards*

Summary judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Id.*

*Discussion*

I.  Judicial Admission

Defendants assert that Plaintiffs' counsel admitted at during a telephonic status conference initiated by the court that the Opinion addressing the Plaintiffs' claims based on the VAR Plan also disposed of all of Plaintiffs' AIP-based claims.  Defendants argue that this is a judicial admission that bars Plaintiffs from pursuing their claims under sections 2(b)(2)(b) and 2(b)(3) of the Agreement, which are based on the AIP.  Defendants rely on *United States v. Crawford*, 372 F.3d 1048 (9th Cir. 2004), in support of this argument.

In *Crawford*, the Ninth Circuit held that the defendant was bound by the clear and express concessions made by defense counsel in both the appellate briefs and at oral argument. *Id.* at 1055.

PAGE 12 - OPINION AND ORDER                                                {SIB}

However, *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir. 1988), the precedent expressly relied on by the Ninth Circuit in *Crawford,* was limited to statements made in briefs and gave the district court the discretion to treat such statements as binding judicial admissions. The *Lacelaw* court recognized the well-established rule that under federal law, "stipulations and admissions in the pleadings are generally binding on the parties and the Court," but then noted that the alleged admissions currently before it were contained in a brief, not a pleading. *Lacelaw*, 861 F.2d at 226 (citation omitted). The court acknowledged that the Ninth Circuit had yet to decide "whether statements made in briefs or other memoranda constitute judicial admissions" and adopted the holding of the Tenth Circuit that statements contained in a party's trial brief "may be considered admissions of the party in the discretion of the district court." *Id.* at 227.

The statement characterized by Defendants as a judicial admission was an oral statement made during an informal status conference that was not reported. The statement was not contained in a pleading or a brief. For this reason alone, the statement does not qualify as a judicial admission. Even assuming it was a judicial admission, Plaintiffs' counsel denies making the statement. Counsel for Plaintiffs participating in the status conference believes that he stated he "was not sure whether there would be any issues remaining regarding the AIP."[6] (Larson Decl. ¶ 3.) This raises a genuine issue of material fact on whether Plaintiffs' counsel even made the judicial admission which precludes the granting of summary judgment based on the admission. Finally, because the statement was not contained in a pleading, the court would have discretion to treat the statement as a judicial admission. In light of the circumstances presently before, the court exercises its discretion in favor

---

[6]Notes taken during the status conference by the court and his staff indicate that only the constructive dismiss/discharge claims and the issue of future VAR's remained and support Defendants' position.

of Plaintiffs and finds that the statement is not a judicial admission.

II.  Request for Additional Discovery

Plaintiffs request an opportunity to conduct additional discovery under FED. R. CIV. P. 56(f) on the issue of whether changes in the AIP led to a reduction in their opportunity to earn bonuses consistent with the 2006-2007 AIP.  Rule 56(f) provides:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1)  deny the motion;
> >
> > (2)  order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
> >
> > (3)  issue any other just order.

The party seeking discovery to oppose the motion must show that the additional discovery requested may actually make a difference in the outcome of the motion.  *McCormick v. Fund Am. Companies, Inc.*, 26 F.3d 869, 885 (9th Cir. 1994).  They must "identify by affidavit the specific facts that further discovery would reveal, and explain why those facts preclude summary judgment."  *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).

Defendants argue that Plaintiffs have failed to comply with the requirements of Rule 56(f) in two particulars:  1) the affidavits offered by Plaintiffs do not identify specific facts that would be revealed through additional discovery; and 2) the affidavits offered by Plaintiffs do not explain how the facts would preclude the granting of summary judgment.  In his declaration in opposition to Defendants' motion for summary judgment, Plaintiffs' counsel represents that Plaintiffs requested the production of documents which contained information necessary to support their allegations "that PPM had planned and was implementing changes to the AIP that adversely impacted plaintiffs" and

that "[d]espite the obvious relevance of this information, defendants refused to produce any responsive documents."[7] (Larson Decl. ¶ 4.) These representations, which merely generally describe the types of information sought (documents supporting their allegations that PPM planned an implemented changes to the AIP) and do not reveal or explain why that information would have precluded summary judgment, are insufficient. Plaintiffs did not comply with the strict requirements of Rule 56(f) and are not entitled to the continuance they request.

Even if the court were to look to other sources for the information required under the Rule, it is not convinced that the documents requested would provide the information desired. In their opposition papers, Plaintiffs' rely on statements from Wah and Hudgens made after the April 2007 acquisition of Scottish Power by Iberdola that the incentive plan for Iberdola employees was inconsistent with the AIP and that changes would need to be made to address the inconsistencies. The two options to be considered were merging all employees into one plan or maintaining two separate plans, one for Iberdola USA employees and one for PPM employees. Plaintiffs also speculate that the new incentive plan may have capped the employees annual bonuses. Plaintiffs admit that as of the effective date of their termination on January 15, 2008, no changes to the AIP had been announced. Plaintiffs then complain that they have not had an opportunity to pursue discovery on what changes were eventually announced and argue that the reasonable estimate of the Plaintiffs' 2007-2008 AIP awards supports their assumption that changes to the AIP were made. At oral argument, Plaintiffs indicated that the new evidence they sought was what changes, if any, PPM

---

[7]Plaintiffs decided not to move to compel production of the requested documents upon learning of Defendants' refusal to produce the documents on January 29, 2010, but rather waited until filing their opposition to Defendants' motion for partial summary judgment on March 2, 2010, to request additional time to seek such documents.

made to the AIP or the number of AIP participants, during the thirteen months following the Change in Control.

The record reveals that Wah advised the Plaintiffs in letters dated December 5, 2007, that the ScottishPower implementation deed required PPM to keep the existing AIP plan in place for at least a year following the Change in Control. "As a result, PPM extended the AIP's in place for the FY ended 3/31/2007 into the FY ending 3/31/09, and there have been no changes to the AIP or its administrative guidelines." Wah also told Plaintiffs that no new groups had been placed under the AIP. (Willey Decl. Ex. 10 at 2.) Hudgens admits that he discussed the fact that Iberdola had a different incentive plan in place for fiscal year 2006-2007, but denies telling Plaintiffs that PPM had decided to make any changes. (Hudgens Supp. Decl. ¶ 3.) Hudgens represents that prior to the effective date of their resignation, he told Plaintiffs that PPM was going to keep the AIP in place for at least a year and that no Iberdola USA employees would be added as participants to the AIP. Plaintiff do not dispute that they were provided this information and, in fact, admit that as of their termination date, no changes to the AIP had been announced. Additionally, at oral argument, Defendants' counsel represented that they had produced the entire administrative record, including all documents relied on by Wah in responding to Plaintiffs request for benefits under the Agreement, which would necessarily include the 2007-2008 AIP in effect as of that date. Accordingly, it is clear from the record that as of January 2008, Plaintiffs knew that the AIP had not been changed.

Hudgens testified that the AIP remained the same for 2008-2009 fiscal year as well. Plaintiffs have not presented any evidence that this testimony is false. Plaintiffs speculation that this statement is false based on alleged statements from Wah and Hudgens that changes would be made to the AIP, which they admit did not occur as of January 15, 2008, and the decrease in their AIP

PAGE 16 - OPINION AND ORDER                                                      {SIB}

bonuses for 2007-2008 based on the estimates of Willey, which decrease could be attributable to factors other than a change in the AIP, is not sufficient to refute Hudgens's testimony.

The court is not convinced that the specific facts sought by Plaintiffs – that PPM changed the AIP after the Change in Control and what changes were made – exist. Even if such evidence does exist, the arguments Plaintiffs make with regard to such evidence, as discussed below, would not compel denial of summary judgment. Plaintiffs request for additional discovery is denied.

III. Material Alteration in Compensation Due to Changes in AIP

Plaintiffs argue that after the Change in Control, there was a reduction in the opportunity to earn bonuses consistent with the 2006-2007 AIP. Plaintiffs point to the change in the structure of recognizing business value and profit contribution, resulting in lower EBIT awards, the dilution of the AIP bonus pool by the addition of Iberdrola USA personnel, and the adoption of a different incentive plan, as causes of the reduction in AIP bonuses. Plaintiffs also offer their prior awards under the AIP as evidence of a material change from the historical level of participant awards. However, none of these arguments are relevant when viewed in light of this court's holding that the definition of Material Alteration in Compensation set forth in the Agreement "requires purely monetary, 'dollars and cents' analysis of whether compensation remained comparable, rather than analysis of whether the three pay components remained comparable. . . . The critical question is whether . . . Plaintiffs' total compensation, as measured in monetary terms, actually increased. (Opinion at 23.) As this court previously noted, "if Daul had not resigned, his total direct compensation for the one-year period following the purchase of Scottish Power would have been $2,471,231, which is $625,982 more than it was during the one-year period prior to the purchase. Similarly, had Grube not resigned, his total compensation would have been $1,845,377, which is

$610,637 more than it was the previous year." (Opinion at 23-24 (citations omitted).) A material change from the historical level of participant awards or the reasons for such a change is not relevant under this definition. This court reiterates its finding that there was no Material Alteration in Compensation due to the restructuring of pay components, including the AIP.

What Plaintiffs appear to be doing here is seeking a reconsideration of the Opinion. A party may seek reconsideration of a ruling on a summary judgment motion under either FED. R. CIV. P. 59(e) or FED. R. CIV. P. 60(b). A motion for reconsideration under FED. R. CIV. P. 59(e) must be filed within 10 days after entry of the judgment while motions under FED. R. CIV. P. 60(b) must be filed within a reasonable time, not to exceed one year after entry of judgment for motions brought under subsections (1) through (3) of Rule 60(b).

The district court generally applies the same analysis under both rules. "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)(citing *All Hawaii Tours, Corp. v. Polynesian Cultural Center*, 116 F.R.D. 645, 648 (D. Hawaii 1987), *rev'd on other grounds*, 855 F.2d 860 (9th Cir. 1988)). To be successful, a motion for reconsideration must meet two requirements. "First, it must demonstrate some reason why the court should reconsider its prior decision. Second, it must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *All Hawaii Tours*, 116 F.R.D. at 649.

Rule 60(b)(1) specifically allows a court to correct a final judgment where the judgment was based on "mistake, inadvertence, surprise or excusable neglect." However, the parties are limited

to the arguments previously made and addressed by the court. "A motion for reconsideration is an improper vehicle to tender new legal theories not raised in opposition to summary judgment." *All Hawaii Tours*, 116 F.R.D. at 650. The decision to correct a judgment for mistake or inadvertence, whether made by a party or the court, rests in the discretion of the trial court. *Fidelity Federal Bank, F.S.B. v. Durga Ma Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004).

The catchall provision of Rule 60(b) is found in subsection six which allows a court to correct a judgment "for any other reason that justifies relief." To qualify for relief under this provision, a party must "establish the existence of extraordinary circumstances which prevented or rendered him unable to prosecute an appeal." *Martella v. Marine Cooks & Stewards Union, Seafarers Int'l. of North America*, 448 F.2d 729, 730 (9th Cir. 1971).

Plaintiffs have failed to present any newly discovered evidence or identify any intervening change in case law. Virtually all of the evidence offered by Plaintiffs in opposition to the motion for summary judgment was offered with regard to the prior summary judgment motion and, if not, was clearly available at that time. Plaintiffs do not cite to any case law, or mention any intervening change in case law, in their opposition brief. Finally, Plaintiffs do not argue that this court committed clear error, that the findings in the Opinion were manifestly unjust or the result of mistake, inadvertence, surprise or excusable neglect, or that the existence of extraordinary circumstances prevent them from prosecuting an appeal. Accordingly, Plaintiffs have failed to establish that they are entitled to a reconsideration of the Opinion.

In any event, Plaintiffs' current arguments are primarily premised on their assumption that the 2006-2007 AIP was replaced with a different incentive plan and that the addition of Iberdrola USA personnel would dilute the AIP bonus pool. The only evidence on this issue is found in

Hudgens's Supplemental Declaration. Hudgens states that "PPM decided to maintain the FY 2006-07 AIP without changes for two years after the Iberdrola transaction in April 2007. . . . Thus, through April 1, 2009, the AIP remained in place and no new groups or Iberdrola USA employees were added to it." (Hudgens Supp. Decl. ¶ 5.) Plaintiffs' assumptions are refuted by this evidence and any arguments based on these assumptions are not supported.

Additionally, Plaintiffs argue that following the Change in Control, PPM eliminated the build-to-sell business opportunity, which was one of the fastest growing business segments in the market for wind energy and resulted in a significant increase in the EBIT, and the AIP bonus pool, for the year in which the transaction was completed. The record shows that in the five years Plaintiffs were employed by PPM, PPM participated in only one build-to-sell project and that, as a result of that project, Daul's AIP bonus jumped from $150,000 for fiscal year 2004-2005 to $900,000 for fiscal year 2005-2006 while Grube's AIP bonus decreased from $375,000 for fiscal year 2004-2005 to $325,000 for fiscal year 2005-2006. The fact that PPM decided not to pursue any build-to-sell opportunities in the two years following the Change in Control is not a material change from PPM's historical participation in build-to-sell projects.

Similarly, Plaintiffs argue that following the Change in Control, PPM shifted its focus to installing as many megawatts as possible rather than generating the most EBIT or profit per megawatt, which resulted in a decrease in the AIP bonus pool and a corresponding decrease in the historical levels of participant awards under the AIP. The evidence shows that Daul received a $1,200,000 AIP bonus award for fiscal year 2006-2007, which represents a $300,000 increase from the prior fiscal year. Grube received a $625,000 AIP bonus award for fiscal year 2006-2007, which also represents a $300,000 increase from the prior fiscal year. Plaintiffs argue that based on the

historical levels of AIP awards, Daul should have received an AIP bonus award of $2,209,020 in fiscal year 2007-2008, representing an annual increase of $1,009,020, and Grube should have received an AIP bonus award of $1,486,810 in fiscal year 2007-2008, representing an annual increase of $861,810. However, the average annual increase in AIP for Plaintiffs in the prior five years (excluding the large increase for Daul and the slight decrease for Grube in fiscal year 2005-2006 in which the one build-to-sell transaction was completed) was $123,335 for Daul and $185,000 for Grube. Based on these historical averages, the AIP bonuses estimated by PPM for Plaintiffs for fiscal year 2007-2008 had they not resigned, which represented an annual increase of $35,470 for Daul and $40,570 for Grube, more closely follow the historical levels than the increases proposed by the Plaintiffs.

This court previously found that there was no Material Alteration in Compensation due to the restructuring of pay components and Plaintiffs have not established that they are entitled to a reconsideration of this ruling. Accordingly, Defendants are entitled to partial summary judgment on the AIP-based claims based on the Opinion. Even assuming that the prior rulings do not apply to the AIP-based claims, Plaintiffs' arguments in support of their contention that a Material Alteration in Compensation under the AIP occurred after the Change in Control based on changes to the AIP itself, the number of AIP participants, or PPM business strategies are not supported by the record. The court finds that Plaintiffs did not comply with the strict requirements of Rule 56(f) or establish that the additional discovery they seek would compel the denial of Defendants' motion for summary judgment. Plaintiffs' motion for additional discovery is denied.

*Conclusion*

Defendants' motion for partial summary judgment on the AIP-based claims is GRANTED.

PAGE 21 - OPINION AND ORDER                                        {SIB}

Plaintiffs' motion for additional discovery is DENIED.

DATED this 15th day of April, 2010.

JOHN V. ACOSTA
United States Magistrate Judge