FILED
OCT 0 6 2010

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

TY DAUL and RAIMUND GRUBE,                           Case No.: 08-CV-524-AC

              Plaintiffs,                               OPINION AND ORDER

      v.

PPM ENERGY, INC., now known as
IBERDROLA RENEWABLES, INC., and
the SEVERANCE ENHANCEMENTS FOR
KEY PPM EMPLOYEES PLAN,

              Defendants.

_____

ACOSTA, Magistrate Judge:

*Opinion*

    Plaintiffs Ty Daul and Raimund Grube (collectively "Plaintiffs") filed this action against their

former employer PPM Energy, Inc., ("PPM") and the Change in Control Severance Enhancements

PAGE 1 - OPINION AND ORDER                                          {SIB}

for Key PPM Employees Plan (the "Plan") (collectively "Defendants") in state court. In their complaint, Plaintiffs allege that PPM breached the Special Severance Protection Agreement entered into by the parties on April 16, 2007, (the "Agreement") by not paying them the severance pay and benefits they were entitled to under the Agreement when they resigned. Defendants removed the action to this court on May 1, 2008, on the basis that the Agreement is an employee benefit plan under the federal Employee Retirement Income Security Act (29 U.S.C. §§ 1001 *et seq.* (2006)(the "Act" or "ERISA"), and, thus, federal law preempts Plaintiffs' breach of contract claim.

This court has already issued four opinions in this matter. First, it denied Plaintiffs' motion to remand to state court in Findings and Recommendation entered July 23, 2008, which recommendation was adopted by the Article III judge on September 17, 2008. Second, in an Opinion[1] entered August 14, 2009, this court found the applicable standard of review to be *de novo* based on significant procedural irregularities in the review process which denied Plaintiffs the right to appeal at the administrative level. Third, this court granted summary judgment to Defendants on Plaintiffs' claims relating to PPM's Value Appreciation Rights Plan ("VAR Plan") in an Opinion entered December 14, 2009. This court found that: "Plaintiffs' voluntary elimination of their rights under the VAR Plan did not constitute a Material Alteration in Compensation"; "no Material Alteration in Compensation occurred because the RVAR Plan[2] did not eliminate Plaintiffs' opportunity to earn comparable value for the growth of PPM"; and "there was no Material Alteration in Compensation due to restructuring of pay components." Finally, this court granted summary

---

[1]The parties subsequently had consented to jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1) on January 30, 2009.

[2]The RVAR Plan is identified as the Replacement Value Appreciation Plan offered to all VAR Plan participants in September 2007. (Opinion at 6.)

judgment to Defendants on Plaintiffs' claims relating to PPM's Annual Incentive Plan ("AIP") in an Opinion entered April 15, 2010, relying on the same analysis employed by this court in its previous opinion. In the same Opinion, this court also denied Plaintiffs' request for additional discovery on issues related to the AIP in the April 15, 2010, opinion.

Now before the court are Plaintiffs' motion to supplement the record with evidence produced by Defendants in June 2010 and motions for reconsideration of this court's prior grants of partial summary judgment to Defendants with regard to Plaintiffs' claims under both the VAR Plan and the AIP or, in the alternative, of its denial of Plaintiffs' request for additional discovery under Rule 56(f). Plaintiffs argue that the new evidence, which they claim relates to the Agreement and should have been produced as part of the administrative record well before the summary judgment motions were filed, requires the court to reverse its prior rulings. Defendants assert that the evidence does not qualify either as newly discovered evidence or part of the administrative record. The court agrees with Defendants on the first assertion and finds that because the evidence was either known to Plaintiffs or, with due diligence, could have been discovered by Plaintiffs prior to the summary judgment rulings, Plaintiffs are not entitled to supplement the record or for reconsideration of the rulings made at the summary judgment stage.

*Legal Standard*

A party may seek reconsideration of a ruling on a summary judgment motion under either FED. R. CIV. P. 59(e) or FED. R. CIV. P. 60(b). A motion for reconsideration under FED. R. CIV. P. 59(e) must be filed within 28 days after entry of the judgment while motions under FED. R. CIV. P. 60(b) must be filed within a reasonable time, with an outside limit of one year after entry of judgment for motions brought under subsections (1) through (3) of Rule 60(b).

The district court generally applies the same analysis under both rules, and its decision is reviewed for abuse of discretion. *See Fidelity Federal Bank, F.S.B. v. Durga Ma Corp.*, 387 F.3d 1021, 1023 (9th Cir. 2004)(discussing Rule 60(b)); *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1441 (9th Cir. 1991)(discussing Rule 59(e)). Three major grounds justify reconsideration: "the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)(*citing All Hawaii Tours, Corp. v. Polynesian Cultural Center*, 116 F.R.D. 645, 648 (D. Hawaii 1987), *rev'd on other grounds*, 855 F.2d 860 (9th Cir. 1988)). Reconsideration is the exception; as the Ninth Circuit has observed, reconsideration is warranted only by these and "[o]ther, highly unusual, circumstances." *School Dist. No. 1J*, 5 F.3d at 1263. *See also Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003)(noting that Rule 59(e) "offers an 'extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources,'" *citing* 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 59.30[4] (3d ed. 2000)).

## Discussion

Plaintiffs seek to supplement the record with new evidence and ask the court to reconsider its prior summary judgment rulings based on this new evidence. Rule 60(b)(2) specifically allows a court to reconsider a judgment when a party presents "newly discovered evidence that, with reasonable diligence, could not have been discovered [earlier]." A party relying on newly discovered evidence to support its request for reconsideration must establish that "the evidence (1) existed at the time of the trial, (2) could not have been discovered through due diligence, and (3) was 'of such magnitude that production of it earlier would have been likely to change the disposition of the case.'"

*Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990)(*quoting Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 211 (9th Cir. 1987)).  Evidence is not newly discovered if it was in the moving party's possession or the moving party could have, with due diligence, discovered and produced the evidence to the court prior to, or at the time of, the hearing.  *Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985).

Plaintiffs argue that five pieces of evidence produced by PPM in June 2010 in response to discovery requests qualify as newly discovered evidence and support reconsideration of the summary judgment rulings.  This evidence consists of the following five documents:

- Exhibit 1 - A document entitled "Retention/Severance Proposal for PPM" discussing a proposal designed to retain PPM employees who might be susceptible to offers by competitors in light of the uncertainty created by the Iberdola transaction in which the existing severance plan would be enhanced for a limited time period.

- Exhibit 2 - An email dated February 7, 2007, forwarding a draft schedule for the change in control severance plan from Dan Rosborough to Linda Wah.

- Exhibit 3 - A document entitled "Proposal" apparently formally proposing that PPM enter into new severance plan with a select group of twenty-five officers and key employees for the purpose of retaining key leadership for at least one year following the closing of the Iberdola transaction.

- Exhibit 4 - An email thread between Linda Wah, Terry Hudgens, and Stephen Dunn, dated February 26, 2007, and February 27, 2007, in which a version of the proposal found in Exhibit 3 is forwarded for input and to explain the protection PPM has in the event an employee elects to leave early.

• Exhibit 5 - An email thread between Mark Tumbach, Terry Hudgens, and Ty Daul,

all dated September 20, 2007, discussing the draft VAR settlement program.

Plaintiffs argue that because these documents clearly relate to the Agreement, they should

have been produced as part of the administrative record. The question of whether the documents

should have been produced as part of the administrative record is not relevant to the issues before

the court. Rather, the court must consider whether the evidence, which was not produced by

Defendants until after the summary judgment motions were ruled on, meets each of the factors

required to support the motion for reconsideration based on newly discovered evidence. For the

reasons set forth below, the court finds that the evidence does not qualify as newly discovered

evidence and that Plaintiffs are not entitled to supplement the record or reconsideration of the rulings

on summary judgment.

The history of the discovery issues between the parties in this action is extensive and well

documented. When Defendants removed this action to this court on May 1, 2008, Plaintiffs had

already filed a motion for summary judgment in state court asking the court to find that Defendants

had breached a contract to pay severance benefits to Plaintiffs under the Agreement. The motion,

as well as the discovery deadline, was stayed pending resolution of the motion to remand filed by

Plaintiffs on May 21, 2008. At a Rule 16 conference held September 26, 2008, after the motion to

remand was denied, this court ordered Defendants to provide Plaintiffs with the administrative

record by October 6, 2008; ordered the parties to confer regarding the administrative record by

October 27, 2008; and termed the pending motion for summary judgment with leave to refile. At

this time, Plaintiffs had already served Defendants with their First Request for Production.[3]

---

[3]Plaintiffs' First Request for Production was dated September 23, 2008.

{SIB}

At a conference call held on October 10, 2008, this court extended the deadline for Defendants' production of nonprotected documents to October 10, 2008, and to October 15, 2008, for protected documents. By letter dated October 24, 2008, Plaintiffs expressed concern that Defendants still had not produced all of the documents Plaintiffs considered to be part of the administrative record and asked for an extension to October 31, 2008, to advise the court of their position on the need for additional discovery. The court granted this request by minute order on October 28, 2008.

In a letter dated October 30, 2008,[4] Plaintiffs asked the court for assistance to resolve a few outstanding discovery issues. The issues identified in the letter were Plaintiffs' concern that the administrative record was incomplete in that it contained very few documents relating to Defendants' analysis of Plaintiffs' claims for benefits under the Plan and it was unclear who was responsible for administering the Plan; that no documents outside of the administrative record had been produced, such as documents relating to the nature, extent and effect on the decision-making process of any conflict of interest on Defendants' part; and that Defendants had failed to produce a privilege log identifying documents withheld under the attorney-client or work-product privilege. In response, the court ordered Defendants to file by November 7, 2008, a response to the letter identifying any documents it objected to producing, and Plaintiffs to file a reply brief by November 12, 2008. The court also ordered Defendants to produce a privilege log.

In their response letter dated November 7, 2008, Defendants represented that they had produced documents relevant to the analysis of Plaintiffs' claims. They objected to producing

---

[4]The correspondence exchanged by the parties and the court in an attempt to informally resolve the discovery dispute is attached to this Opinion in an Appendix.

documents relating to Defendants' conflict of interest until the proper standard of review was determined, as well on privilege and relevance grounds. Defendants also requested that the court enter a protective order in the case.

In their November 12, 2008, reply, Plaintiffs again expressed concern that the administrative record was not complete, and they identified pointing to four categories of evidence that they considered to be missing. These included: 1) communications among Iberdola employees from Spain; 2) notes from oral communications; 3) documents that were apparently omitted from production; and 4) employment agreements from five named individuals in management positions. Plaintiffs argued that, based on documents already produced, it appeared that Iberdola employees in Spain were responsible for analyzing and determining Plaintiffs' claims but that very few communications with or between Iberdola employees based in Spain were produced, especially during the period from November 16, 2007, to December 5, 2007, the date of the letter from Linda Wah to Plaintiffs advising them of the denial of their claims for benefits. Plaintiffs sought notes from oral communications based on the lack of documentary evidence and the inability to depose Linda Wah due to her death subsequent to the communications at issue. Plaintiffs identified three documents in their position identified as emails from Linda Wah to Plaintiffs, which Plaintiffs felt should have been part of the administrative record but which had not been produced by Defendants. This caused Plaintiffs to question Defendants' production response and to specifically request that Defendants produce all communications regarding the termination of Plaintiffs. Finally, Plaintiffs argued that they were entitled to the requested employment agreements to establish a conflict of interest regardless of the applicable standard of review.

Defendants responded with a letter dated November 17, 2008, in which they indicated that

they would produce all nonprivileged communications between Iberdola employees in Spain and again requested the court enter a protective order. Defendants continued their objections to producing the employment agreements, or engaging in additional discovery, until after the court determined the appropriate standard of review.

In a minute order dated November 18, 2008, documenting a telephone status conference, this court ordered Defendants to produce the rest of the administrative record and privilege log by November 24, 2008. The court also set a briefing schedule on the issue of the appropriate standard of review. In an opinion dated August 14, 2009, this court determined that *de novo* review was the applicable standard in this matter.

Shortly thereafter, Defendants served their First Request for Productions on Plaintiffs through an email dated August 28, 2009, which included the following language:

> Attached please find PPM's First Requests for Production in this matter.

> Last fall, discovery is this case was stayed pending our production of the Administrative Record to you and resolution of the standard of review issue. Just before that, you had issued RFPs to us. Now that we have produced the record to you, will you be issuing new RFPs to us or do you want us to respond to the ones you already sent us? We assume the latter, but want to make sure before we spend additional time preparing our response.

> Also, we would like to talk with you on Monday or Tuesday of next week to set dates for each party's responses to the RFPs. We suggest October 2, 2009. Also, we need to discuss setting other deadlines in this case as well as what other discovery we each intend to pursue.

> Please let us know some times that you are available on Monday or Tuesday.

On August 31, 2009, Plaintiffs advised Defendants that they intended to file a motion for partial summary judgment on the VAR Plan. In light of this, the parties agreed to stay discovery pending the resolution of the summary judgment motion.

Plaintiffs filed their motion for partial summary judgment on the VAR Plan on September 1, 2009. Defendants responded and filed a cross motion on the same issues on September 29, 2009. On October 26, 2009, Plaintiffs replied without requesting additional time for discovery under FED. R. CIV. P. 56(f). This court denied Plaintiffs' motion for partial summary judgment and granted Defendants' motion for summary judgment in an opinion dated December 14, 2009.

At a scheduling conference held on January 8, 2010, this court set a new discovery completion deadline of May 14, 2010, on all remaining issues, and a new dispositive motion deadline of June 18, 2010. The parties subsequently agreed to withdraw their First Requests of Production and serve new requests. The parties' respective Second Requests for Production were dated and exchanged on January 15, 2010. Within three weeks, each had responded to the other's Second Requests for Production in writing, asserted objections to certain groups of documents, and agreed to produced the nonobjectionable documents.

After some confusion about whether Plaintiffs had conceded that the summary judgment ruling on the VAR Plan applied to the AIP as well. On February 6, 2010, Defendants filed for partial summary judgment on the claim related to the AIP. In their opposition brief, Plaintiffs argued that summary judgment was not appropriate and, in the alternative, asked for additional time to conduct discovery pursuant to FED. R. CIV. P. 56(f).

On April 15, 2010, this court granted Defendants' motion for summary judgment, finding the analysis of the term "Material Alteration in Compensation" set forth in the prior opinion applied to the AIP-based claims as well. This court denied Plaintiffs' request for additional discovery. After this time, the only claim that remained was Plaintiffs' claim for constructive discharge.

Between May 3, 2010, and June 18, 2010, Defendants produced more than 1,500 pages of

documents relevant to Plaintiffs' constructive discharge claims based on Plaintiffs' job responsibilities and scope of authority both before and after the Iberdola acquisition. During this period of time, this court granted the parties' request for an extension of the discovery deadline to July 13, 2010. This court subsequently extended the same deadline to August 31, 2010.

In a letter to Plaintiffs' counsel dated July 30, 2010, Defendants confirmed that Plaintiffs had agreed to dismiss the remaining constructive discharge claims with prejudice. That same day, Plaintiffs filed the motions that are currently before the court. On August 2, 2010, Defendants advised the court by email of Plaintiffs' decision to dismiss the constructive discharge claims.

Both summary judgment motions were ultimately resolved by this court's determination, as set forth in the opinion dated December 14, 2009, that Plaintiffs did not suffer a Material Alteration in Compensation as that term is defined in the Agreement. The evidences establishes that prior to this date, Plaintiffs had either actual knowledge or, with due diligence, could have had knowledge of the five documents they are now submitting to the court.

It is evident from the face of the September 2007 email string offered as Exhibit 5 that Plaintiffs knew of the exhibit prior to December 2009. Daul was a named recipient of the email string and, in fact, authored one of the emails in the string. While not so obvious, it appears from numerous emails dating from February 16, 2007, to March 23, 2007, that Plaintiffs knew of the existence of the other four "newly discovered" documents offered by Plaintiffs, all of which relate to drafts of the Agreement created in or about February, 2007.

In the first email dated February 16, 2007, Grube, the author, represents that he "walked through the severance language" with Wah and expressed some of his concerns to her about the proposed language, and that Wah agreed to make the language regarding "changes in

responsibility/position and change in location triggering VAR and deferred bonuses" more explicit. Daul received a copy of this email. In email correspondence dated March 3, and March 4, 2007, Daul and Grube again discuss Grube's concerns on "the clarification of material change to position/responsibility/location." Two weeks later, Grube emailed Wah to see if there had been any progress on the issue they discussed a few weeks ago, including "retention, clarification of severance and compensation." On March 20, 2007, Wah advised Grube that the severance arrangements with Iberdola would be finalized in a few days and she would be able to discuss them in more detail at that time. Three days later, Wah informed Grube that they had been "able to get something approved on the severance side," that she was working on a document, and that Terry wanted to talk to Grube about it that day.

These emails establish that Grube, and to some extent, Daul, were involved in the drafting of the Agreement, had been given the opportunity to review drafts of the Agreement, and were asked to comment on the terms of the Agreement prior to its execution. Under the relevant test, a party seeking reconsideration of a prior ruling based on newly discovered evidence must establish that they could not have, with due diligence, discovered and produced the evidence to the court prior to the ruling. While it is not clear whether Plaintiffs reviewed any of the specific documents now offered by Plaintiffs, it is undeniable that Plaintiffs had reason to know that drafts of the Agreement existed before the December 14, 2009, ruling on the cross-motions for summary judgment and, therefore, could have discovered the evidence and presented it to the court before the ruling was issued.

The recitation of the discovery process in this case reveals that Plaintiffs questioned Defendants' position on the contents of the administrative record from the outset. In the hope of resolving this issue, Plaintiffs made specific requests for production of additional documents from

PAGE 12 - OPINION AND ORDER                                                          {SIB}

Defendants and for help in obtaining the documents from the court. Ultimately, Defendants agreed to produce some of the requested documents and this court deferred production of others until after the appropriate standard of review had been determined. Once the standard of review issue was resolved, Defendants attempted to move forward with discovery. Rather than pursue additional discovery, Plaintiffs opted to file a motion for summary judgment. As a result, the parties agreed to stay discovery yet again. Similarly, once Plaintiffs were aware of the court's construction of the term "Material Alteration in Compensation" in its December 14, 2009, ruling, Plaintiffs did not vigorously pursue the production of the newly offered evidence which they now argue was of such magnitude it would likely have changed the court's ruling, despite Plaintiffs' knowledge of the existence of the drafts of the Agreement and the asserted importance of those drafts to the proper interpretation of the definitive term "Material Alteration in Compensation."

Even with knowledge of the existence of drafts of the Agreement, the documents which they now claim are pivotal to the issues raised in the summary judgment motion, Plaintiffs chose to forego additional discovery until after the motions for summary judgment were resolved. Based on this knowledge, the court concludes that Plaintiffs could have, with due diligence, discovered and produced the five documents to the court before December 2009. This conclusion is strengthened by Plaintiffs' aggressive attempts to obtain other documents they believed to exist but did not yet have in their possession. Accordingly, the court finds that the documents are not "newly discovered" evidence under either FED. R. CIV. P. 59(e) or 60(b)(2) and do not provide justification for Plaintiffs' motion to supplement or motions for reconsideration.

*Conclusion*

Plaintiffs' motion (#117) to supplement, motion (#119) to reconsider the December 14, 2009,

summary judgment ruling, and motion (#121) to reconsider the April 15, 2010, summary judgment

ruling are all DENIED.

DATED this 5th day of October, 2010.

JOHN V. ACOSTA
United States Magistrate Judge

# APPENDIX

# STOLL BERNE
STOLL STOLL BERNE LOKTING & SHLACHTER P.C. LAWYERS

Steve D. Larson
slarson@stollberne.com

October 30, 2008

**VIA HAND DELIVERY**

Honorable John V. Acosta
U.S. District Court for the District of Oregon
1000 SW Third Avenue
Portland, OR 97204

> Re:   **Ty Daul and Raimund Grube v. PPM Energy, Inc.**
>       **U.S. District Court for the District of Oregon Case No. 08-524 AC**

Dear Judge Acosta:

Pursuant to the Court's minute order on September 26, 2008, defendant has produced some documents it contends should be a part of the administrative record in this case. Plaintiffs have conferred with defendant about its production and are requesting the Court's assistance to resolve a few outstanding issues.

First, plaintiffs believe that defendant's production is incomplete, even with respect to the documents the Court directed to be produced at this stage of the litigation. So far, defendant has produced approximately 350 pages of documents, but its production contains virtually no documents relating to defendant's analysis of the merits of plaintiffs' claims for benefits, and the production contains no documents relating to the process for denial of benefits and the review of such denials under the SSPA (including procedures in place for notice, for review, etc.).

It is also unclear from defendant's production who was actually responsible for administering the SSPA. This may be because defendant has produced no documents evidencing communications between Iberdrola USA employees, and specifically the Spanish employees, who took over the decision making at PPM after Iberdrola became the parent company.

Ty Daul and Raimund Grube were told by PPM's CEO, Terry Hudgens, and by the plan administrator for PPM's regular severance plan, Linda Wah, that Martin Mugica, Alvaro Delgado and Xabier Viteri would be making all decisions about their termination, and that they should direct their termination notice to Martin Mugica. Ty Daul and Raimund Grube are positive that there were e-mails between the Spanish employees of Iberdrola and Iberdrola USA

Honorable John V. Acosta
October 30, 2008
Page 2

_____

regarding Ty Daul and Raimund Grube.  Indeed, the attached e-mail from Martin Mugica (AR 00304) demonstrates that Mr. Mugica is conveying information to Human Resources in Spain, which would be to Mr. Delgado.  We thought defendant was going to produce those documents yesterday, but defendant has, so far, failed to produce them.  The Court should order those communications produced.

Second, while the parties disagree at this point whether the standard of review in this case should be *de novo* or abuse of discretion, even under the more deferential standard plaintiffs are entitled to have discovery of additional documents outside of what defendant contends is the administrative record, including documents relating to the nature, extent, and effect on the decision-making process of any conflict of interest on the part of defendant.  *Abatie v. Alta Health & Life Insurance Company*, 458 F.3d 955 (9th Cir. 2006). In particular, certain employees of defendant, including Mr. Hudgens, have employment agreements that tie bonuses to the retention of subordinates.  Messrs. Mugica, Delgado and Viteri, as well as Ms. Wah, may have similar agreements.  All of these agreements (including Mr. Hudgens' agreement) should be produced.

Third, defendant has indicated it will, but so far it has not produced a privilege log identifying each document withheld from production on the grounds of attorney-client privilege or work product protection.

Once the information described above is produced, plaintiffs, and the Court, will be in a better position to evaluate whether depositions of Terry Hudgens, Linda Wah, Martin Mugica, Alvaro Delgado and Xabier Viteri will be required in order to develop a complete administrative record, so we can learn how defendant analyzed the merits of plaintiffs' claims for benefits, what the process was for denial of benefits and the review of such denials under the SSPA, and who was actually responsible for administering the SSPA.

Respectfully submitted,

Steve D. Larson

SDL:dc

cc:    Robert E. Maloney Jr. (Via Hand Delivery)
       William T. Patton (Via Hand Delivery)

**Norton, Jenifer**

| | |
|---|---|
| **From:** | Mugica Nicolas, Martin |
| **Sent:** | Friday, November 16, 2007 1:24 PM |
| **To:** | Daul, Ty |
| **Subject:** | RE: Confidential - for Martin |

Ty,

I do not recognize that not coninuing your employement with us is in the best interest of me or IBERDROLA, on the contrary it is a big loss for us. I have conveyed all the issue to Human Resources.

Martin

**From:** Daul, Ty [mailto:Ty.Daul@PPMEnergy.com]
**Sent:** Friday, November 16, 2007 2:21 PM
**To:** Mugica Nicolas, Martin
**Cc:** Grube, Raimund
**Subject:** Confidential - for Martin

Martin,

As we discussed last night, here is the additional information. Look forward to talking at 1pm PST.

Ty



Ty Daul
Vice President, Business Development - Renewables
Iberdrola
1125 NW Couch, Suite 700
Portland, OR 97236
(503) 796-7117 direct
(503) 796-6907 fax
(503) 789-1407 mobile
ty.daul@ppmenergy.com
www.ppmenergy.com

🖨 In the interests of the environment, please use discretion when printing

AR 00304

10/24/2008



LANE POWELL
ATTORNEYS & COUNSELORS

WILLIAM T. PATTON
503.778.2015
pattonw@lanepowell.com

November 7, 2008

**VIA HAND DELIVERY**

The Honorable John V. Acosta
United States Magistrate Judge
U.S. District Court for the District of Oregon
Mark O. Hatfield U.S. Courthouse
1000 SW Third Avenue
Portland, OR 97204-2902

Re:    *Daul and Grube v. PPM Energy, Inc., now known as Iberdrola Renewables, Inc.*
       US District Court for Oregon, Case No. CV 08-524 AC

Dear Judge Acosta:

Pursuant to the court's order of November 3, 2008, defendant PPM Energy, Inc., now known as Iberdrola Renewables, Inc. ("PPM"), submits this letter concerning the status of discovery.

Plaintiffs are correct that PPM has produced nearly 350 pages of documents constituting the administrative record in this matter. PPM, however, respectfully disagrees with plaintiffs' characterization of those documents. Contrary to what plaintiffs claim, PPM has produced plan documents concerning to the process for reviewing claims for severance benefits under the SSPP. Furthermore, plaintiffs' claim that PPM has produced no documents relating to the analysis of the merits of plaintiffs' claims is simply wrong. The attached letter of December 5, 2007, from Linda Wah (then PPM's Vice President of Human Resources) to Mr. Daul is just one document that plainly evidences PPM's analysis of plaintiffs' claims. Ms. Wah sent a similar letter to Mr. Grube.

On October 23, 2008, plaintiffs requested all e-mails between the Spanish employees of Iberdrola Renovables S.A. ("Iberdrola") regarding their claim for severance benefits. As PPM has indicated to plaintiffs' counsel, it will produce documents reflecting non-privileged communications between Iberdrola employees in Spain regarding plaintiffs' claims (if there are any such documents which have not already been produced). PPM's counsel is working diligently with the Iberdrola employees to confirm whether or not there are additional documents in Spain regarding plaintiffs' claims.

On October 23, 2008, plaintiffs also requested the employment agreements of Linda Wah, Terry Hudgens (the CEO of Iberdrola Renewables, Inc.), Martin Mugica (Senior Vice President, Renewables, of Iberdrola Renewables, Inc.), Xabier Viteri (CEO of Iberdrola), and

www.lanepowell.com          A PROFESSIONAL CORPORATION          LAW OFFICES

T. 503.778.2100             601 SW SECOND AVENUE, SUITE 2100     ANCHORAGE, AK . OLYMPIA, WA
F. 503.778.2200             PORTLAND, OREGON                     PORTLAND, OR . SEATTLE, WA
                            97204-3158                           LONDON, ENGLAND

The Honorable John V. Acosta
November 7, 2008
Page 2

Alvaro Delgado (the Director of Human Resources of Iberdrola).  Plaintiffs apparently believe that these agreements may contain retention incentives which they claim are relevant to showing a conflict of interest under *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955 (9th Cir. 2006).  PPM objects to this request.  First, plaintiffs' request is premature.  In ERISA benefits cases, conflict of interest discovery can only be relevant if the standard of review is abuse of discretion.[1]  If, as plaintiffs claim, the standard of review is *de novo*, then conflict of interest discovery is irrelevant.[2]  Thus, the issue of whether plaintiffs are entitled to conflict of interest discovery should not be addressed until after the court determines the appropriate standard of review.

Second, assuming that abuse of discretion is the applicable standard of review, plaintiffs are not entitled to conflict of interest discovery simply because they say a structural conflict of interest exists (because PPM funds benefits under the severance plan).[3]  Rather, plaintiffs are only entitled to conflict of interest discovery if they make a threshold showing that the administrator's decision was tainted by the conflict of interest.[4]  Plaintiffs have not made such a showing.

Third, Messrs. Hudgens, Mugica, Viteri, and Delgado were not the chief decision-makers on plaintiffs' claims.  Plaintiffs were told to forward their claim to Spain which they did.  The Spanish employees (such as Mr. Delgado) were involved in discussions with plaintiffs aimed at possibly retaining them.  But, as to the merits of the claim for severance benefits, the Spanish employees deferred to Linda Wah on that.  Lind Wah's employment agreement does not contain a retention incentive.

Fourth, the employment agreements for Messrs. Mugica, Viteri, and Delgado are subject to strict Spanish privacy and data protection laws which may prevent their disclosure by Iberdrola.

Finally, the employment agreements contain confidential information concerning the employees' compensation and other terms of their employment which are not relevant to this action.

In addition to the issues discussed above, the Court will recall that the parties have a dispute concerning whether the court should enter a protective order in this case.  PPM still believes that such an order is appropriate in this matter and it will be submitting to the court a

---

[1] *Abatrie,* 458 F.3d at 965 ("[T]he existence of a conflict of interest is relevant to how a court conducts abuse of discretion review.").

[2] *See id.* at 970.

[3] *See Chadwick v. Metropolitan Life Ins. Co.,* 498 F.Supp.2d 1309, 1316 (E.D. Cal. 2007) ("[T]he only purported 'evidence' of a conflict of interest is the fact of defendant's role as the administrator and funder of the Plan.  In such cases, courts have not granted discovery.").

[4] *Baldoni v. UnumProvident,* 2007 WL 649295 (D. Or. 2007).

The Honorable John V. Acosta
November 7, 2008
Page 3


proposed protective order similar to the one that was entered in *Tinn v. EMM Labs, Inc.,*
CV-07-963 AC (D. Or. 2008).

PPM welcomes the opportunity to confer with plaintiffs' counsel concerning any additional
discovery that plaintiffs believe is warranted at this stage. In addition, PPM believes that the
next logical step in this case is to determine the applicable standard of review. This issue
should be decided next because that will impact the scope of discovery in this ERISA
benefits case. The undersigned will confer with plaintiffs' counsel about setting a briefing
schedule on that issue.

Very truly yours,

William T. Patton

Enclosure
cc (w/enc.):    Steven Larson, Esq. (via e-mail)



**PPM Energy**

December 5, 2007

Sent via electronic mail and messenger.
*Signature receipt confirmation requested*

Ty Daul
1125 NW Couch Street #700
Portland, Oregon 97209

Dear Ty:

I am writing in response to your letter dated November 15, 2007. As I have previously stressed to you, we consider you to be an important member of PPM's management team, and hope that you will remain with PPM and continue to perform your duties diligently.

I respectfully disagree with the assertions in your letter that anything has occurred since Iberdrola's purchase of ScottishPower that makes you eligible for enhanced severance benefits under section 2 (b) of the Special Severance Protection Program ("the Program"). I will take this opportunity to respond to the salient points raised in your letter.

<u>Your Claim</u>: Earnings opportunities adversely impacted by material changes in long-term incentive compensation plan structures. VAR Plan eliminated by Replacement VAR Plan "which provides an inferior earnings opportunity."

<u>Response</u>: Your adoption of the Replacement VAR Plan, which is of a contractual nature, was voluntary. There is no reasonable basis for your claim that the valuation formula under the Replacement VAR will fail to produce valuations that are as good as the valuation methodology under the prior plan.

<u>Your Claim</u>: "Prior to the Change in Control" the VAR Plan valuation methodology was based on the PPM enterprise value – which included a "market value" adjustment in the event of a Change in Control."

<u>Response</u>: Besides what has already been expressed, "Change in Control" as defined under the Program is different from "Change in Control" as defined under the original VAR Plan. "Market value" based valuations occurred only upon the occurrence of an "SP Change in Control" followed by a "Trigger Event" within a period of time following this SP Change in Control.

AR 00238

The fact remains that you freely and voluntarily elected to replace your VAR rights with the rights defined under the Replacement VAR Plan. The Replacement VAR Plan cannot constitute, and did not constitute at the time of its adoption, a material detrimental alteration in compensation. In fact, it constitutes a material *improvement* in your compensation. Indeed, the amount *already* paid to you under the Replacement VAR Plan significantly *exceeds* the amount that you would have received under the prior VAR Plan.

<u>Your Claim</u>: "Corporate restructuring has resulted in PPM Energy being integrated into a new global renewable energy company ... which will result in dilution by other participants and dilution with other businesses."

<u>Response</u>: I don't fully understand your position here. Under the ScottishPower implementation deed, PPM is required to keep the existing AIP plans in place. Any claim that there is now "dilution" of your compensation opportunities is both unfounded and speculative.

<u>Your Claim</u>: There is no longer any long-term incentive plan in place.

<u>Response</u>: This simply is not the case. Again, under the implementation deed, PPM is required to keep its existing AIP plans in place. Moreover, under the Replacement VAR Plan, your VARs will continue to reflect increases in the value of the Renovables IPO through October 1, 2011. I do not understand how you can claim that there has been any detrimental change regarding compensation.

<u>Your Claim</u>: The above factors have eliminated opportunity to earn comparable value appreciation for PPM's growth

<u>Response</u>: Again, this is pure speculation. The Replacement VAR Plan is intended to (and is reasonably believed) to provide value that is at least as good as the prior VAR Plan. Other compensation arrangements have not been changed to your detriment.

<u>Your Claim</u>: Bonus opportunity adversely impacted by changes in incentive structure, practices and administrative guidelines put in place since the "Change in Control."

<u>Response</u>: The ScottishPower implementation deed requires that all compensation and benefit schemes in place at the time of Iberdrola's acquisition be maintained for at least a year following the "Change in Control." As a result, PPM extended the AIPs in place for the FY ended 3/31/2007 into the FY ending 3/31/2008, and there have been no changes made to the AIP or its administrative guidelines in effect for the 2008 fiscal year.

<u>Your Claim</u>: Practices since the change in control have eliminated the "build to sell" opportunity, "which removes significant opportunity to realize value for ... efforts to develop assets and other business opportunities."

<u>Response</u>: No changes have occurred regarding your ability to continue to acquire assets or develop other business opportunities. There has been no impairment, detriment or "material reduction" in your job duties or responsibilities within the meaning of the Program. Your responsibilities and duties were discussed with you in depth, and were a result of suggestions that you made. We are surprised at your claim because you previously never objected to these responsibilities or duties.

2

<u>Your Claim</u>: Employees of Iberdrola USA "appear" to be brought into the AIP and their inclusion will "dilute" the AIP bonus pool.

<u>Response</u>:  No new groups have been placed under the AIP bonus pool.

 <u>Your Claim</u>: Organizational restructuring has resulted in material changes in the scope of your responsibilities and limits "key measures linked to reward opportunity" under the AIP.

<u>Response</u>:  You have been given broader responsibilities that have increased your role and importance to PPM, and your resulting compensation opportunities have actually increased.  These changes in your responsibilities were implemented only *after* they were discussed with you, and you voluntarily agreed to them.

<u>Your Claim</u>: Job responsibilities and scope of work have substantially changed and been substantially diminished.

<u>Response</u>:  Again, you have been given broader responsibilities that have increased you compensation opportunities.

I sincerely hope, that after you review this matter, you will continue to serve as a valuable member of PPM's management team. The company is open to discussing your concerns as they relate to your continued employment and would like to schedule a meeting with you in the near future to begin those discussions. If there are specific actions you believe the company should take that would cure your claim under the Program, please provide us with those in writing by next week. I should also note that you remain subject to the full term of your non-competition and non-solicitation agreements.

Sincerely,

Linda Wah
Vice President, Human Resources
PPM Energy, Inc.

I acknowledge receipt of this letter on December 5, 2007:

_____
        Ty Daul

3



STOLL STOLL BERNE LOKTING & SHLACHTER P.C. LAWYERS

Steve D. Larson
slarson@stollberne.com
RECVD'08 NOV 12 16:41 USDC-ORP

November 12, 2008

**VIA HAND DELIVERY**

Honorable John V. Acosta
U.S. District Court for the District of Oregon
1000 SW Third Avenue
Portland, OR 97204

     **Re:**    **Ty Daul and Raimund Grube v. PPM Energy, Inc.**
             **U.S. District Court for the District of Oregon Case No. 08-524 AC**

Dear Judge Acosta:

     Pursuant to this Court's November 3, 2008, minute order, the following is in reply to defendants' November 7, 2008 letter concerning the status of discovery in this matter. Plaintiffs believe that much of the controversy regarding discovery has arisen because it is not clear how much, if any, of the administrative record has actually been produced. As plaintiffs explained in their letter to this Court dated October 30, 2008, defendants' production of documents this far "contains virtually no documents relating to defendants' analysis of the merits of plaintiffs' claims for benefits, and the production contains no documents relating to the process for denial of benefits and the review of such denials under the SSPA (including procedures in place for notice, for review, etc.)." October 30 letter at 1.

     In their November 7, 2008, letter, defendants point to a single letter (or, rather, two essentially identical letters) from Linda Wah to plaintiffs dated December 5, 2007. Defendants also produced a memorandum from Ms. Wah that makes a passing reference to the merits of plaintiffs' benefits claim, but nothing else in the documents produced to date appears to concern that subject. There are no e-mails, notes or spreadsheets showing any analysis of whether there had been a "material alteration in compensation" or a "constructive dismissal.

     Because it is unclear what the administrative record is, or even if there is one, plaintiffs should be entitled to obtain evidence regarding the decision-making process for the denial of their claim. Without a complete evidentiary record, it would be very difficult, if not impossible, for the court to decide the merits of plaintiffs' claims.

Honorable John V. Acosta
November 12, 2008
Page 2

_____

The documents plaintiffs seek fall into four categories: (1) communications among Iberdrola employees from Spain; (2) notes from oral communications; (3) documents that were apparently omitted from production; and (4) the employment agreements of Linda Wah, Terry Hudgens, Martin Mugica, Xabier Viteri and Alvaro Delgado. In addition, plaintiffs seek to take depositions to develop evidence regarding the decision-making process. The other two issues raised in the correspondence relate to a privilege log, and whether or to what extent a protective order should be entered. These issues are addressed in turn below.

### 1. Communications among Iberdrola employees from Spain

In their November 7 letter, defendants state that Messrs. Mugica, Viteri, and Delgado were not the chief decision-makers on plaintiffs' claims. However, the e-mails from Iberdrola employees in Portland to Iberdrola employees in Spain show exactly the opposite. For example, the attached Ex. 1 (AR00151-AR00158), dated November 20, 2007, is a "confidential negotiation proposal" drafted by Ms. Wah and Mr. Hudgens and sent to Mugica and Delgado "to help [them] in making a determination" regarding plaintiffs' claims for benefits under the SSPA. *See* Ex. 1 at AR00151.

Ex. 2 (AR00201) is an e-mail dated November 16, 2007, from Mr. Hudgens to Mr. Viteri saying that "Martin [Mugica] is working through his thoughts on whether to try to extend their [Daul and Grube] work here or shorten it." The e-mail also states that he "asked that Linda put together a point sheet on the terms of their arrangements and bonus plan facts to share with Alvaro [Delgado] and us." In a later e-mail in the e-mail string shown in Exhibit 2, Mr. Viteri then asks Mr. Delgado: "tienes una valoracion," which roughly means "do you have a value" or as we might say, "what is the cost."

In accord with Mr. Hudgens instruction, Ms. Wah asked her compensation manager, Tonja Willey, on November 16, 2007, to prepare a summary for those in the "special severance protection" showing base salary, target bonus, deferred bonuses currently outstanding, and VARs outstanding that would be accelerated and the value. Ex. 3 (AR00092-AR00093, at p. 93). Those are the amounts that would be owed if there was a "material alteration in compensation" or a "constructive dismissal.'

It is interesting to note that after the e-mails described above were exchanged, there is a gap in the production, and no other documents regarding whether there had been a "material alteration in compensation" or a "constructive dismissal" were produced until the December 5, 2007 letter. Plaintiffs believe that the communications on this issue were taking place between the Iberdrola employees based in Spain, and it was those employees who directed Ms. Wah to draft the December 5 letter. That is corroborated by the fact that she sent a draft of the December 5 letter to Messrs. Mugica, Delgado and Mr. Delgado's interpreter, Ms. Susquet. Ex. 4 (AR00232). It is also telling that neither the December 5 letter nor any other document produced to date reflects any process for denial of benefits, any right of review under the SSPA, or any notice that plaintiffs may have a right to file suit in federal court.

Honorable John V. Acosta
November 12, 2008
Page 3

_____

Ex. 5 (AR00121) is an e-mail dated January 10, 2008, from Ms. Wah to the compensation manager, Ms. Willey, stating "Alvaro [Delgado] has asked us to provide him with the amounts we owe Ty and Raimund under normal termination (resignation terms)." This seems to indicate that Mr. Delgado was involved in the decision, and that the denial of benefits was a business decision, and not based on the validity of the claim for benefits.

Ex. 6 (AR00132) is an e-mail from Ms. Wah to Ty Daul saying "maybe we might have some movement on your severance claim." "I don't have any update other than to say a response approach is being reviewed in Spain." This also indicates that the decision-making was taking place in Spain.

E-mail communications from Iberdrola employees in Spain to Iberdrola employees in Portland also show that the decisions were being made by the Iberdrola employees in Spain. After receiving letters from plaintiffs notifying defendants that plaintiffs' Employee Initiated Resignations pursuant to the SSPA became effective on January 14, 2008, Mr. Delgado sent a form letter to Ms. Wah, and tells her (via Ms. Suquet) that it should be sent to plaintiffs. *See* Ex. 7 (AR00136-AR00139). The actual letters sent to plaintiffs by Ms. Wah Ex. 8 (AR00140-AR00141) are worded identically to the form letter sent by Delgado.

Thus, defendants' own documents clearly show that Messrs. Mugica, Viteri, and Delgado were directing the ultimate course of action. However, to date, defendants have produced no documents relating to any communications between these three Iberdrola employees regarding Ty Daul and Raimund Grube.

It is unclear whether defendants are refusing to produce these documents, or are simply delaying the production. Counsel for defendants said that the documents produced on October 15, 2008, included communications between Iberdrola employees based in Spain, but that is not the case. The documents produced on October 15, 2008, include communications to Iberdrola employees in Spain from Iberdrola employees in Portland, and vice versa. No communications have been produced evidencing communications between Iberdrola employees based in Spain.

Defendants suggest in their letter that they might produce the documents someday, but assert that they have not had enough time because plaintiffs only asked for these e-mails on October 23, 2008. That is inaccurate. On Sept. 26, 2008, this court ordered that the administrative record should be produced. Plaintiffs' October 23rd letter was simply to inquire why communications among the decision-makers had not been produced as part of the administrative record. Defendants have had plenty of time to work with the Spain-based employees to determine whether responsive documents exist. In fact, Exhibit 2 (AR00201) shows that Alvaro Delgado was providing certain select documents to Iberdrola's lawyer in Spain, Fernando Manrique, on October 14, 2008. All communications between Iberdrola employees from Spain regarding Ty Daul and Raimund Grube should be produced immediately.

Honorable John V. Acosta
November 12, 2008
Page 4

### 2. Notes of oral communications

Based on the lack of documents regarding any analysis of the claims, plaintiffs believe there may have been oral discussions on that issue. That is why notes of oral communications should be produced.

There is an added reason why notes should be produced. Unfortunately, Ms. Wah recently passed away, so we will not be able to obtain her testimony regarding anything that she was orally told by the Iberdrola employees based in Spain. Therefore, notes of oral communications should be produced so we can fully develop the evidence regarding the decision-making process.

### 3. Omitted Documents

Plaintiffs are concerned that defendants have either not searched for all the documents regarding communications about the claims for benefits by Ty Daul and Raimund Grube, or have chosen to exclude certain documents. For example, Ex. 9 is an e-mail from Ms. Wah to Ty Daul and Raimund Grube dated December 7, 2008. Ms. Wah informs plaintiffs in this e-mail that Alvaro Delgado would like to schedule a meeting with them on December 18th. She says that she will be joining them, but that she does not know the process, which indicates that the decision-making was being handled by Iberdrola employees in Spain. This document was not produced by defendants.

Ex. 10 is an e-mail from Ms. Wah to Ty Daul and Raimund Grube dated December 17, 2007. In this e-mail Ms. Wah tells plaintiffs that they should be prepared to discuss "what caused you to submit notice of your resignation." She also said that for the discussion, "you should presume that the company is going to dispute the fact that you have triggered severance provisions." This document was also not produced by defendants.

Ex. 11 is an e-mail from Ms. Wah to Ty Daul and Raimund Grube dated December 26, 2007. In this e-mail Ms. Wah tells plaintiffs that Alvaro [Delgado] is not the decision maker on the non-compete issue but that Xabier [Viteri] felt strongly about it. Again this e-mail shows that the decisions were being made by the Iberdrola employees based in Spain. This document was also not produced by defendants.

If documents that were sent to plaintiffs regarding their claim for benefits are not being produced, plaintiffs wonder what other important documents are also being omitted from production. Plaintiffs believe that the only way that plaintiffs and the court can have access to the documents relating to the decision-making process is for the court to order defendants to produce all communications regarding the termination of Ty Daul and Raimund Grube.

Honorable John V. Acosta
November 12, 2008
Page 5

_____

### 4. Employment Agreements of Wah, Hudgens, Mugica, Viteri and Delgado.

The last group of documents at issue are the employment agreements of Ms. Wah, and Messrs. Hudgens, Mugica, Viteri and Delgado.  Plaintiffs are entitled to these agreements.

*First*, contrary to defendants' assertion, plaintiffs are entitled to documents relating to defendants' conflict of interest regardless of the standard of review.  In the case of *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943-44 (9th Cir.1995), the Ninth Circuit held: "We agree with the Third, Fourth, Seventh, Eighth, and Eleventh Circuits that new evidence may be considered under certain circumstances to enable the full exercise of informed and independent judgment."  *Citing Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir.1993).

In *Quesinberry*, the Fourth Circuit listed a non-exhaustive list of exceptional circumstances where introduction of evidence beyond the administrative record could be considered necessary.  These circumstances include "the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; *instances where the payor and the administrator are the same entity and the court is concerned about impartiality*; ... and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process."  *Quesinberry*, 987 F.2d at 1027 (emphasis added).  In this case, there is no dispute that the payor and the administrator are the same entity, and thus documents relating to defendants' conflict of interest are relevant, even under a *de novo* review.

*Second*, defendants' own documents show that defendants' self-interest materially impacted their decision to deny plaintiffs benefits under the SSPA.  Several of these documents are attached.  For example, Ms. Wah and Mr. Hudgens' "confidential negotiation proposal" sent to Mugica and Delgado for their consideration (Ex. 1 (AR00151-AR00158) shows that defendants considered paying plaintiffs benefits to be one of three different options available to them, and suggested that the option of denying benefits in order to try to negotiate new retention agreements "[b]ecause of the business risks of having Ty and Raimund leave at this time ...."  *See* Ex. 1 at AR0155.  Thus, even if this Court determines that plaintiffs must, as defendants assert, "make a threshold showing that the administrator's decision was tainted by the conflict of interest," the documents submitted herewith are sufficient to make that showing.

*Third*, defendants cite no specific Spanish laws which they assert in fact prohibit disclosure of the employment agreements of Messrs. Mugica, Viteri and Delgado.  If defendants can assert such protection under Spanish law, the proper method of raising their objection is through a motion for protective order under FRCP 26.

*Fourth*, defendants contend that the terms of compensation (including any retention incentives) are not relevant.  However, the terms of compensation are directly relevant because

Honorable John V. Acosta
November 12, 2008
Page 6

those terms will reveal the financial incentives and inherent conflicts of interest that permeated defendants' decision to deny benefits to plaintiffs.

### 5. Depositions

Because of the uncertainty regarding the completeness of the document production, plaintiffs would like to take the depositions of the person or persons most knowledgeable about what search was conducted to obtain the documents produced, and take the deposition of Sara Becker and Julie Hensel, who were Martin Mugica's executive assistants. We believe that Ms. Becker and Ms. Hensel have knowledge regarding the communications between the Iberdrola employees from Spain about Ty Daul and Raimund Grube. Then, after defendants have produced the documents mentioned above, plaintiffs request that they be allowed to take the depositions of Xabier Viteri, Alvaro Delgado, Martin Mugica, Belen Suquet, Terry Hudgens, Dan Rosborough (Ms. Wah's assistant and replacement), and Tonja Willey (Ms. Wah's compensation manager).

These depositions are justified because of the lack of documents relating to the administrative procedures. As mentioned above, introduction of evidence beyond the administrative record may be necessary if there is there are very limited administrative review procedures with little or no evidentiary record. *Quesinberry*, 987 F.2d at 1027 (emphasis added).

The attached exhibits demonstrate that Messrs. Viteri, Delgado, Mugica, Hudgens, and Ms. Suquet were all involved in the discussions regarding the claims for benefits by Ty Daul and Raimund Grube. Since there essentially are no documents regarding administrative procedures, little or no evidentiary record about the analysis of the merits of plaintiffs' claims for benefits, and no documents relating to the process for denial of benefits and the review of such denials under the SSPA, plaintiffs should be entitled to take these depositions.

Plaintiffs seek to take the depositions of Mr. Rosborough and Ms. Willey, because they may have information relating to Ms. Wah's role, if any, in the analysis of the claims for benefits by Ty Daul and Raimund Grube.

### 6. Privilege Log

Defendants have indicated they will provide a privilege log, but plaintiffs still have not received it.

### 7. Protective order

Plaintiffs reiterate their position that no protective order is required in this case, and that if defendants contend such an order is necessary, defendants should file a motion for a protective order under FRCP 26 and make the required showing as to each document they believe is entitled to protection.

Honorable John V. Acosta
November 12, 2008
Page 7

_____

       We welcome the opportunity to discuss these issues further with the Court if the Court deems it necessary.

                                    Respectfully submitted,

                                      Steve D. Larson

SDL:dc
Enclosures

cc:     Robert E. Maloney Jr. (w/encls.-via hand delivery)
        William T. Patton (w/encls.-via hand delivery)

Fw: Confidential Negotiation Proposal

REDACTED

-----Original Message-----
From: Wah, Linda
To: Mugica Nicolas, Martin; Delgado Piera, Alvaro; Suquet Guzman, Belen
CC: Hudgens, Terry
Sent: Tue Nov 20 19:25:53 2007
Subject: Confidential Negotiation Proposal

M <<Grube Compensation Terms.xls>> artin, Alvaro and Belen,


A <<Daul Compensation Terms.xls>> ttached for your consideration an <<Confidential Discussion Strategy.doc>> d review is a paper outlining some background and a negotiation proposal for the discussions with Ty and Raimund.   Terry and I drafted this paper to help you understand some of the background of these individuals and the Special Severance Protections.


We believe there is value in clarifying the company's position as quickly as possible regarding whether we will permit them to trigger their Special Severance Protections. We do not believe they have, and thought this paper might provide some useful information to help you in making a determination.  You have probably already noted this, but the program also permits the company to "cure" any Material Alteration Constructive Dismissal in order to avoid triggering the Special Severance obligations.


Please note that I did not forward this to the Lane Powell attorneys.  If you would like to discuss further, please let us know.

10/14/2008                                        CONFIDENTIAL

Fw. Confidential Negotiation Proposal

Thank you.

Regards,

Linda

AR 00152

10/14/2008                    CONFIDENTIAL

Confidential – PPM Recommendations for Ty Daul and Raimund Grube

## Background

Ty Daul and Raimund Grube are key employees within the US Renewables business. Both have historically delivered strong performance and and are instrumental to the delivery of critical business results for the company, and both are respected and considered to be highly influential with other employees in PPM. We anticipate that announcements of their departures will likely influence other key employees (potentially as many as 20 employees) to leave the organization. Of the two, Ty is most critical from a commercial perspective as well as from the perspective of influencing the opinions of other employees.

Ty and Raimund were granted  participation in a Special Severance Protection Program (see attached Change in Control Severance Enhancements for Key Employees") designed to retain key employees following the Iberdrola transaction. This Special Severance Program was reviewed and approved by Iberdrola. In summary, the program allows for the employees to resign and receive certain termination benefits in the event of an "Qualifying Employer-Initiated Termination" or an "Employee-Initiated Resignation" due to a "Constructive Dismissal" or a "Material Alteration in Compensation." The termination benefits include severance compensation, a prorated bonus, and accelerated vesting in any VARs. Under the regular terms of the Annual Incentive Plan, they would also be eligible for their deferred bonuses from prior performance cycles if they are deemed to be "involuntarily terminated without cause" prior to the payment dates.

Both are subject to non-competition and non-solicitation agreements. Raimund's non-compete is for one year and Ty's is for a minimum period of six months and a maximum period of one year, as determined by the company. Both have a non-solicitation agreement for two years.

These employees have indicated their interest in resigning their employment, subject to confirmation that they would be able to do so under the terms of the Special Severance Protection and with the understanding that the terms of their non-competition agreement would commence during the transitional employment period (which they have tentatively discussed as continuing through January based on their initial conversations with Martin).

## Potential Risks and Consequences of Resignations

Ty and Raimund are deemed critical to the delivery of this year's business plans and budget, and their departures could place our the company's business results at risk.

As indicated above, the departure of these two individuals at this time will substantially increase the company's retention risks with other key employees because of the influence these individuals have on employee opinions about the future of the organization. These employees are also viewed to be highly marketable with other prospective employers.

CONFIDENTIAL

Although they would be restricted from soliciting employees, this would not prevent employees from seeking out opportunities where they go to work.

The company does not currently have clear internal successors to these roles, with Ty's role being the most critical to replace. Although there are some potential individuals internally who could perform the job, this will likely require taking an individual from another critical role within the company and having to backfill that role, or may require that we place an individual who may not have the full qualifications we believe we need to perform this role in terms of experience or leadership. Both positions will be difficult to fill externally, as we have recently tried to fill some other development positions and the labor market is extremely competitive. We also anticipate that top quality candidates will be difficult to recruit because they will question the reasons for the resignations by Ty and Raimund, who are also well-regarded externally in the industry. The estimated time to replace these individuals would be approximately 6 to 12 months.

## Analysis of Compensation Terms in the Event of Resignation

It is our view that at this point, the company has not triggered a "Constructive Dismissal" or a "Material Alteration in Compensation" that would warrant an Employee Resignation qualifying them for compensation as specified in the Special Severance Protection Program. Ty's responsibilities have been expanded to include responsibility for the development projects that were previously under Iberdrola USA, and Raimund would transfer to the Western Region from the Midwest Region but with comparable scope of responsibilities as prior to the Change in Control. There have not been any adjustments to their total remuneration other than the VAR Replacement Plan, which is arguably an enhancement to the VAR valuation methodology and in any event was voluntarily agreed to by both employees. Their bonus opportunity remains the same as previously, and the Annual Incentive Plan includes Change in Control protections this year which require that entire funding pool be paid out and administered according to the same administrative practices as in effect prior to the Change in Control. The company has also made a commitment to maintain this same incentive structure through at least April, 2009.

Assuming that their proposed resignations are deemed not to be a "Qualifying Employee Resignation, " the only compensation they would receive under normal resignation terms at this time would be their vested VARs in the VAR Replacement Plan, valued and paid out as of the next valuation date in October, 2008. This amount would be $307,903 and $311,442 for Ty and Raimund, respectively. They would forfeit their eligibility for any deferred bonus awards and a bonus for the current year, and they would not qualify for severance benefits under the Special Severance Protection (acceleration of their outstanding VARs, 12 months' base pay and target bonus as severance pay, six months' subsidized health benefits, 12 months' outplacement assistance, prorated annual incentive and payout of any deferred bonuses from prior years).

## Recommended Strategy

CONFIDENTIAL

AR 00154

There are three strategy scenarios available to us at this time:

(1) Allow the employees to trigger their Special Severance Protections and leave with the separation benefits under that program.
(2) Accept the resignations of the employees but dispute that they have any rights to Special Severance Protections.
(3) Negotiate with the employees to stay until established retention dates with agreed separation terms after those retention dates. Use the fact that they have not triggered their Special Severance Protections and the value they would be leaving unpaid as leverage for the negotiations.

Because of the business risks of having Ty and Raimund leave at this time, we recommend that the company first clarify its position that we do not agree they have triggered the Special Severance Protections if they should resign at this time, and then negotiate retention arrangements with these individuals so that Ty has a longer retention period (through October, 2008) and Raimund has a shorter retention period (through June, 2008). Although the remuneration they would earn during this retention period would be greater than if they were to sever at this time, the company would retain their services and the value contribution they make to the company. We recommend that the retention arrangements be structured as follows:

(1) The company would agree to limit the scope of their non-competition provisions to 3 months following termination for Ty and 6 months following termination for Raimund (both expiring in December, 2008). Instead, we would use the period of their continued employment to keep them from competing against us.
(2) The company would agree to extend a modified form of Special Severance Protections through the date of their retention periods so that they would have a longer time period in which to determine if a triggering event were to occur in the scope of their responsibilities or in the planned structure of compensation. The triggering events would continue to be Constructive Dismissal or Material Alteration in Compensation, but with some refinement to prohibit them from triggering severance during the retention periods and to narrow the definitions of the triggering events (the definitions do not reflect current circumstances such as the fact that the VAR has been replaced).
(3) Bonus awards during their retention periods would be tied to retention of employees on their respective teams and developing a strong successor for their positions, in addition to normal performance measures.
(4) If the employees stay through the designated retention dates and satisfactorily perform, they would be eligible to resign at that time and receive their deferred AIP awards and a prorated, performance-based annual incentive award. We recommend that we do include accelerated vesting of outstanding VARs unless the company triggers that accelerated vesting under the terms of the VAR Replacement Plan. (By continuing their employment beyond June, they would also be eligible for a full year's performance-based incentive award for 2007/08 and the June, 2008 payout of their deferred bonuses from prior years. Additionally, they would qualify for an accelerated payout of their vested VARs

CONFIDENTIAL

AR 00155

in the October following their terminations).  Additionally, if a triggering event has occurred as of their resignation date, they would be eligible to receive severance compensation as specified in the revised Special Severance program.

(5) The employees would be subject to strict confidentiality regarding their potential departures and the two-year nonsoliciation agreement.

(6) The company would agree to give 60 days' notice of any termination, and the employees would be required to give the company 60 days' notice of their intent to resign.

(7) The employees would be required to execute a Release of Claims in exchange for the company's agreement to provide for certain separation terms following their retention dates.

An analysis of the compensation terms of this recommended strategy is attached.

CONFIDENTIAL

## Compensation Terms
*Ty Daul*

CONFIDENTIAL

AR 00157

**Scenario 1:** A Qualifying Termination or Resignation Has Triggered Under the Special Severance Protection Program

**Summary:** [redacted text]

| Remuneration | | | |
|---|---|---|---:|
| | 12 Months' Base Pay plus Target Bonus | $ | 376,550 |
| | 6 Months' Company-subsidized health benefits | $ | 7,626 |
| | 12 Months' Outplacement Assistance | $ | 25,000 |
| | Pro-rated Annual Incentive Award (could range from target ($129,208) to performance-based; assume performance-based same as 2007 prorated at 10/12) | $ | 1,000,000 |
| | Accelerated Vesting of VARs | $ | 189,812 |
| | Payout of deferred bonuses under the AIP | $ | 1,250,022 |
| | **Total Special Severance Benefits subtotal** | $ | 2,849,010 |
| | Plus: Normal payout of vested VARs | $ | 307,903 |
| | Total | $ | 3,156,913 |

**Scenario 2:** Employee Resignation (no Qualifying Termination or Resignation under the Special Severance Protection Program)

**Summary:** Vested VARs as of October 2008 (Unvested VARs and deferred bonuses fully forfeited) [redacted]

| Remuneration | | | |
|---|---|---|---:|
| | Payment for vested VARs (Oct, 2008) | $ | 307,903 |
| | Not eligible for severance benefits | $ | - |
| | Total | $ | 307,903 |

**Scenario 3:** Recommended Negotiation Terms (Retention through October 31, 2008 with agreed compensation terms upon termination thereafter)

**Summary:** [redacted text]

| Remuneration | | | |
|---|---|---|---:|
| | Normal Bonus for 08 (projection assumes same as 2007; assumes none deferred to future years) | $ | 1,200,000 |
| | Normal Deferred Bonus Payout in 08 | $ | 850,022 |
| | Normal payout of vested VARS in October 2008 | $ | 105,263 |
| | **Normal payout terms subtotal** | $ | 2,155,285 |
| | | | |
| | Payout of Deferred Bonus in 09 | $ | 400,000 |
| | Prorated Performance-Based Annual Incentive Award (projection assumes same as 2007, prorated for 7/12) | $ | 700,000 |
| | Accelerated payout of vested VARs | $ | 380,591 |
| | **Negotiated Retention/Separation Terms subtotal** | $ | 1,480,591 |
| | | | |
| | 12 months' Base Pay plus Target Bonus (contingent and payable only if triggered) | $ | 376,550 |
| | 6 Months' Company-subsidized health benefits (contingent and payable only if triggered) | $ | 7,626 |
| | 12 months' Outplacement Assistance (contingent and payable only if triggered) | $ | 25,000 |
| | **Contingent Payments subtotal** | $ | 409,176 |
| | Total | $ | 4,045,052 |

## Compensation Terms
### *Raimund Grube*

CONFIDENTIAL

AR 00158

**Scenario 1:** A Qualifying Termination or Resignation Has Triggered Under the Special Severance Protection Program

The Special Severance provisions are triggered when a Qualifying Involuntary Termination Under the WARN/CAP Plans occurs sometime during 2008

| Remuneration | | | |
|---|---|---|---:|
| | 12 Months' Base Pay plus Target Bonus | $ | 298,797 |
| | 6 Months' Company-subsidized health benefits | $ | 7,626 |
| | 12 Months' Outplacement Assistance | $ | 25,000 |
| | Pro-rated Annual Incentive Award (could range from target ($93,374) to performance-based; assume performance-based same as 2007 prorated at 10/12) | $ | 520,833 |
| | Accelerated Vesting of VARs | $ | 154,110 |
| | Payout of deferred bonuses under the AIP | $ | 579,175 |
| | **Total Special Severance Benefits subtotal** | $ | 1,585,541 |
| | Plus: Normal payout of vested VARs | $ | 311,442 |
| | **Total** | $ | 1,896,983 |

**Scenario 2:** Employee Resignation (no Qualifying Termination or Resignation under the Special Severance Protection Program)

Employee is paid for vested VARs as of October 2008; forfeits unvested VARs, deferred bonuses, and any other remuneration over and above the above

| Remuneration | | | |
|---|---|---|---:|
| | Payment for vested VARs (Oct, 2008) | $ | 311,442 |
| | Not eligible for severance benefits | $ | - |
| | **Total** | $ | 311,442 |

**Scenario 3:** Recommended Negotiation Terms (Retention through July 1, 2008 with agreed compensation terms upon termination thereafter)

No change to retention bonuses through 2008; vesting of VARs treated same as deal close, with Negotiated Separation terms in lieu of Special Severance terms if triggered

| Remuneration | | | |
|---|---|---|---:|
| | Normal Bonus for 08 (projection assumes same as 2007; assumes none deferred to future years) | $ | 625,000 |
| | Normal Deferred Bonus Payout in 08 | $ | 370,841 |
| | Normal payout of vested VARS in October 2008 | $ | 105,263 |
| | **Normal payout terms subtotal** | $ | 1,101,104 |
| | | | |
| | Payout of Deferred Bonus in 09 | $ | 208,334 |
| | Prorated Performance-Based Annual Incentive Award (projection assumes same as 2007, prorated for 3/12) | $ | 156,250 |
| | Accelerated payout of vested VARs | $ | 398,049 |
| | **Negotiated Retention/Separation Terms subtotal** | $ | 762,633 |
| | | | |
| | 12 months' Base Pay plus Target Bonus (contingent and payable only if triggered) | $ | 298,797 |
| | 6 Months' Company-subsidized health benefits (contingent and payable only if triggered) | $ | 7,626 |
| | 12 months' Outplacement Assistance (contingent and payable only if triggered) | $ | 25,000 |
| | **Contingent Payments subtotal** | $ | 331,423 |
| | | | |
| | **Total** | $ | 2,195,160 |

**Hall, John**

| | |
|---|---|
| **From:** | Delgado Piera, Alvaro [adelgadop@iberdrola.es] |
| **Sent:** | Tuesday, October 14, 2008 10:24 AM |
| **To:** | Fernando Manrique |
| **Subject:** | RV: People |
| **Importance:** | High |

**De:** Viteri Solaun, Xabier
**Enviado el:** sábado, 17 de noviembre de 2007 10:08
**Para:** Delgado Piera, Alvaro
**Asunto:** RV: People

Álvaro, ¿tienes una valoración? Gracias. xvs

**De:** Viteri Solaun, Xabier
**Enviado el:** sábado, 17 de noviembre de 2007 9:17
**Para:** Hudgens, Terry
**Asunto:** RE: People
Terry, in a rush departure from Madrid I left my cell in the office. I hope to recover it this evening. I will call you. I will search for the mentioned letter. Regards, xvs

**De:** Hudgens, Terry [mailto:Terry.Hudgens@PPMEnergy.com]
**Enviado el:** viernes, 16 de noviembre de 2007 23:58
**Para:** Viteri Solaun, Xabier
**Asunto:** People
Xabier,

I have spoken with Ty Daul and Raimund Grube following their conversation yesterday with Martin. They believe they will be happier working elsewhere in the long run, but are concerned over receiving their future bonus and VAR payments which amount to a considerable sum for the both of them. Martin is working through his thoughts on whether to try to extend their work here or to shorten it which he and I will discuss further next week. I "think" there is an opportunity to keep them here and productive for 6 to 12 months if we want to try to go for that. I have asked that Linda put together a point sheet on the terms of their arrangements and bonus plan facts to share with Alvaro and us. For me there is no clear right answer. My primary concern is that we need a strong leader in Portland wind group which Ty is today. Kevin Devlin is probably the next strongest leader. There will be collateral losses if Ty and Raimund leave as many people will ask themselves why stay if these 2 guys see a basis for leaving. We should talk this over when you have a chance.

On a separate matter, I received a call from Karl Olsoni saying that he had signed the relative documents which were being held by his attorney pending receipt of a letter from us setting forth the reason for his termination. I don't know anything about this letter, do you?

Terry

===========================================================
Este mensaje se dirige exclusivamente a su destinatario. Los datos incluidos en el presente correo son confidenciales y sometidos a secreto profesional, especialmente en lo que respecta a los datos personales, se prohibe divulgarlos, en virtud de las leyes vigentes. Si usted no lo es y lo ha recibido por error o tiene conocimiento del mismo por cualquier motivo, le rogamos que nos lo comunique por este medio y proceda a destruirlo o borrarlo, y que en todo caso se abstenga de utilizar, reproducir, alterar, archivar o comunicar a terceros el presente mensaje y ficheros anexos, todo ello bajo pena de incurrir en responsabilidades legales. Cualquier idea contenida en este correo es exclusiva de su autor y no representa necesariamente el criterio de Iberdrola. El

AR 00201

## Wah, Linda

| | |
|---|---|
| **From:** | Willey, Tonja |
| **Sent:** | Saturday, November 17, 2007 8:35 AM |
| **To:** | Wah, Linda |
| **Subject:** | FW: Summary |
| **Attachments:** | Daul VAR Estimates.doc; Mihalik VAR Estimates.doc; Grube VAR Estimates.doc |

Please see attached for VAR information.

**From:** Willey, Tonja
**Sent:** Friday, November 16, 2007 1:08 PM
**To:** Wah, Linda
**Subject:** RE: Summary

Per your request. I will provide your requested VAR information in a separate e-mail. To clarify, you want the VAR as if vesting accelerates, and you want the incremental difference, to be paid at the estimated value of Oct 1, 2008

Ty Daul
- Base Salary:  $221,450
- Target Bonus:  70%
- Deferred incentive outstanding

      To be paid June, 2008
        From 06-07 Award:  $400,000 (NPV)
        From 05-06 Award:  $450,022 (NPV)
      To be paid June, 2009:
        From 06-07 Award:  $400,000 (NPV)

Raimund Grube
- Base Salary:  $186,748
- Target Bonus:  60%
- Deferred incentive outstanding

      To be paid June, 2008
        From 06-07 Award:  $208,333 (NPV)
        From 05-06 Award:  $162,508 (NPV)
      To be paid June, 2009:
        From 06-07 Award:  $208,334 (NPV)

Trevor Mihalik
- Base Salary:
- Target Bonus:
- Deferred incentive outstanding

      To be paid June, 2008:

REDACTED

AR 00092

11/19/2007

**From:** Wah, Linda
**Sent:** Friday, November 16, 2007 12:20 PM
**To:** Willey, Tonja
**Subject:** Summary

Tonja, for those individuals who are in the "special severance protection" (Ty, Raimund, Trevor), can you prepare a summary showing:

- Base Salary
- Target Bonus
- Deferred Bonuses currently outstanding
- VARs outstanding that would be accelerated and the value (assume a payout date of October 2008)

Thanks.

AR 00093

11/19/2007

## Hall, John

| | |
|---|---|
| **From:** | Fernando Manrique [fml@ialonsomartinez.com] |
| **Sent:** | Tuesday, October 14, 2008 8:22 AM. |
| **To:** | Dauenhauer, Lorne; Patton, William |
| **Subject:** | Fwd: RV: Revised Letters |

**Attachments:** Grube.Raimond.Letter.pdf; ATT5052762.htm; Daul.Ty.Letter.pdf; ATT5052763.htm

Dear Lorne and Bill,

Please find enclosed copy of the documents I am relaying.

Regards

Fernando

Inicio del mensaje reenviado:

> **De:** "Delgado Piera, Alvaro" <adelgadop@iberdrola.es>
> **Fecha:** 14 de octubre de 2008 15:41:51 GMT+02:00
> **Para:** "Fernando Manrique" <fml@ialonsomartinez.com>
> **Asunto:** RV: Revised Letters


-----Mensaje original-----
De: Wah, Linda [mailto:Linda.Wah@PPMEnergy.com]
Enviado el: miércoles, 05 de diciembre de 2007 18:48
Para: Webber, Donna
CC: Delgado Piera, Alvaro; Suquet Guzman, Belen
Asunto: Fw: Revised Letters
Carácter: Confidencial

Here is the final letter for transmittal. Please copy Martin, T
<<Grube.Raimond.Letter.pdf>> <<Daul.Ty.Letter.pdf>> erry, Alvaro and Belen on the
transmittal email.  Thank you!  Call me on my cell if you have questions.

-----Original Message-----
From: Irvine, Erica <eirvine@iberdrolausa.com>
To: Wah, Linda
Sent: Wed Dec 05 09:41:33 2007
Subject: RE: Revised Letters


Erica K. Irvine, PHR

Human Resources Manager

AR 00232

10/15/2008

## Willey, Tonja

**From:** Willey, Tonja
**Sent:** Thursday, January 10, 2008 2:41 PM
**To:** Wah, Linda
**Subject:** RE: Ty and Raimund

I spoke with Leslie (Rachel was in this a.m. but is out the rest of the day)and she said she would like to wait until tomorrow when Rachel is back to compile the payroll amounts below.

As far as the terms below, see my comments next to each.
-----Original Message-----
From: Wah, Linda
Sent: Thursday, January 10, 2008 1:27 PM
To: Willey, Tonja
Subject: Ty and Raimund

Alvaro has asked us to provide him with the amounts we owe Ty and Raimund under normal termination (resignation terms). I think this would be:

Final pay through Monday (does Rachel know to get check ready)? YES

Accrued unused PT for Raimund   YES (not Ty)

Vested VAR payouts in October 2008   YES--we of course will not know the amount to be paid until the Oct 1 valuation, but we could estimate using the floor (20% CAGR) and/or 25% CAGR

Deferred comp (if Ty participated)   NO--Ty did not participate

Normal 401(k) distribution   No automatic distribution of 401(k)--does Alvaro want to know their 401(k) balance?

COBRA   Assuming resignation, no subsidized COBRA; does Alvaro want to know what it will cost Ty and Raimund?

No deferred bonuses   Correct, deferred AIP/NPV forfeited

No prorated bonus   Correct, forfeit AIP/NPV for the current plan period

No compensation during the non-compete period because they resigned.   Correct

Can you please confirm if this is how you would interpret their terms?

AR 00121

8/13/2008

**Rosborough, Dan**

| | |
|---|---|
| **From:** | Wah, Linda |
| **Sent:** | Monday, July 14, 2008 1:07 PM |
| **To:** | Rosborough, Dan |
| **Subject:** | FW: Company Subsidized Cobra Health Benefits |

-----Original Message-----
From: Wah, Linda
Sent: Friday, January 25, 2008 10:13 AM
To: 'daulhouse@comcast.net'
Subject: Re: Company Subsidized Cobra Health Benefits

Ty, you should make sure. You enroll for COBRA so you don't lose coverage.  Payment for
COBRA can occur later and maybe we might have some movement on your severance claim in the
meantime.  As you know, this will be a slow process so make sure you keep your coverage.

I don't have any update other than to say a response approach is being reviewed in Spain.

Hope you're doing well.  I am still out (had another bout of anemia) so working from home
as I can.

-----Original Message-----
From: daulhouse@comcast.net <daulhouse@comcast.net>
To: Wah, Linda
Sent: Fri Jan 25 08:55:18 2008
Subject: Re: Company Subsidized Cobra Health Benefits

Linda,

I hope things are OK and you are feeling better.  I'm sure it can't be any fun -
especially when adding all the integration headaches and stress on top of it.

Take care,

Ty


-------------- Original message --------------
From: daulhouse@comcast.net

Linda,

Attached is a letter with some questions and comments on the company subsidized
cobra health benefits.

Thanks

Ty

1

AR 00132        PPM 00089

## Rosborough, Dan

| | |
|---|---|
| **From:** | Wah, Linda |
| **Sent:** | Monday, February 04, 2008 2:46 PM |
| **To:** | Rosborough, Dan; Fetzer, Julia |
| **Subject:** | Fw: Letter to Raimund |

| | |
|---|---|
| **Importance:** | High |
| **Sensitivity:** | Confidential |

| | |
|---|---|
| **Attachments:** | Dauh & Grube Ltr.DOC; ATT1121152.txt |

Can you please see if you can open the attachment and send me a copy of the text in either
word or email?  I can't open it via blackberry or citrix.  Thank you!

-----Original Message-----
From: Suquet Guzman, Belen <bsuquet@iberdrola.es>
To: Wah, Linda
Sent: Mon Feb 04 02:32:20 2008
Subject: Letter to Raimund


ATT1121152.txt
(282 B)
Hi L        nda,
We would like for you to send this letter to Raimund Grube.
The only information missing to be accomplish is highlighted in yellow.
Many thanks,
B

-----Mensaje original-----
De: Delgado Piera, Alvaro
Enviado el: viernes, 01 de febrero de 2008 17:55
Para: Suquet Guzman, Belen
Asunto: RV: Carta contrastada
Importancia: Alta
Carácter: Confidencial

Hola, buenas tardes:
Tenemos que enviar esta nota, contrasta por LP y FM, a Linda para que se la hagan llegar a
Raimund Grube.
Many Thanks,
Un besos
Álvaro

-----Mensaje original-----
De: Fernando Manrique [mailto:fml@ialonsomartinez.com] Enviado el: viernes, 01 de febrero
de 2008 16:52
Para: Delgado Piera, Alvaro
Asunto: Carta contrastada

                                                                          PPM 00085

Querido Alvaro:

Conforme a lo acordado, adjunto remito la versión de borrador contrastada por el equipo
legal de Estados Unidos, tal y como indicaba en mi anterior correo, y que como de
costumbre someto a tu consideración.

Tal y como puedes ver, resulta firme, desde una posición prudente.
Para facilitar visualmente todo, he marcado en amarillo lo único que quedaría por rellenar

                                        1

                                                                        AR 00136

del texto, que sería la fecha efectiva de la última carta que en su día se les remitió, en la que se daba respuesta a sus preguntas.

Sin otro particular, recibe un cordial saludo.

Fernando Manrique

=========================================================================
Este mensaje se dirige exclusivamente a su destinatario. Los datos incluidos en el presente correo son confidenciales y sometidos a secreto profesional, especialmente en lo que respecta a los datos personales, se prohibe divulgarlos, en virtud de las leyes vigentes. Si usted no lo es y lo ha recibido por error o tiene conocimiento del mismo por cualquier motivo, le rogamos que nos lo comunique por este medio y proceda a destruirlo o borrarlo, y que en todo caso se abstenga de utilizar, reproducir, alterar, archivar o comunicar a terceros el presente mensaje y ficheros anexos, todo ello bajo pena de incurrir en responsabilidades legales. Cualquier idea contenida en este correo es exclusiva de su autor y no representa necesariamente el criterio de Iberdrola. El emisor no garantiza la integridad, rapidez o seguridad del presente correo, ni se responsabiliza de posibles perjuicios derivados de la captura, incorporaciones de virus o cualesquiera otras manipulaciones efectuadas por terceros.


This message is intended for the exclusive attention of the address(es) indicated. Any information contained herein is strictly confidential and privileged, especially as regards personal data, which must not be disclosed, in accordance with legislation currently in force. If you are not the intended recipient and have received it by mistake or learn about it in any other way, please notify us by return e-mail and delete this message from your computer system. Any unauthorised use, reproduction, alteration, filing or sending of this message and/or any attached files to third parties may lead to legal proceedings being taken. Any opinion expressed herein is solely that of the author(s) and does not necessarily represent the opinion of Iberdrola. The sender does not guarantee the integrity, speed or safety of this message, not accept responsibility for any possible damage arising from the interception, incorporation of virus or any other manipulation carried out by third parties.
=========================================================================

PPM 00086

AR 00137

Dear _____ :

I am writing in response to your letter dated January 15, 2008.  Again, we respectfully

disagree that you are eligible for enhanced severance benefits under Section 2(b) of the

"Special Severance Protections" and "Change in Control Severance Enhancement for Key

PPM Employees" dated March 23, 2007.  Our position on this matter was set out point-by-

AR 00138

PPM 00087

**Error! No text of specified style in document.**
Page 2


point in my December _____, 2007 letter to you. We do not see that anything has changed

since that letter to support your claim that you experienced either a "Constructive Dismissal"

or "Material Alteration in Compensation." I would be happy to sit down with you to discuss

these issues further. If you would like to do so, please let me know so that we can set up a

meeting.

                                            Sincerely,

                                            PPM ENERGY, INC.


AR 00139

PPM 00088



**PPM Energy**
A ScottishPower Company

February 5, 2008

Mr. Ty Daul
11077 SE Rimrock Drive
Happy Valley, OR 97236

Dear Ty:

I am writing in response to your letter dated January 15, 2008. Again, we respectfully disagree that you are eligible for enhanced severance benefits under Section 2(b) of the "Special Severance Protections" and "Change in Control Severance Enhancement for Key PPM Employees" dated March 23, 2007. Our position on this matter was set out point-by-point in my December 5, 2007 letter to you. We do not see that anything has changed since that letter to support your claim that you experienced either a "Constructive Dismissal" or "Material Alteration in Compensation."

I would be happy to sit down with you to discuss these issues further. If you would like to do so, please let me know so that we can set up a meeting.

Sincerely,

Linda M. Wah
VP Human Resources, PPM Energy

LMW:bp

AR 00140        PPM 00084



**PPM Energy**
A ScottishPower Company

February 5, 2008

Mr. Raimund Grube
7924 SE 36th Avenue
Portland, OR 97202

Dear Raimund:

I am writing in response to your letter dated January 15, 2008. Again, we respectfully disagree that you are eligible for enhanced severance benefits under Section 2(b) of the "Special Severance Protections" and "Change in Control Severance Enhancement for Key PPM Employees" dated March 23, 2007. Our position on this matter was set out point-by-point in my December 5, 2007 letter to you. We do not see that anything has changed since that letter to support your claim that you experienced either a "Constructive Dismissal" or "Material Alteration in Compensation."

I would be happy to sit down with you to discuss these issues further. If you would like to do so, please let me know so that we can set up a meeting.

Sincerely,

Linda M. Wah
VP Human Resources, PPM Energy

LMW:bp

AR 00141

PPM 00008

Daul, Ty
_____

**From:**          Grube, Raimund
**Sent:**          Friday, December 07, 2007 11:24 AM
**To:**            Wah, Linda; Daul, Ty
**Cc:**            Hudgens, Terry
**Subject:**       Re: Meeting in Radnor


No problem.  I will plan to fly out on the 19th.


-----Original Message-----
From: Wah, Linda
To: Grube, Raimund; Daul, Ty
CC: Hudgens, Terry
Sent: Fri Dec 07 11:22:49 2007
Subject: RE: Meeting in Radnor

I think so.  Alvaro and Belen are leaving on the evening of the 18th.  You should probably
plan to spend all day in Radnor because we could be delayed in getting together (they
often have to spend all morning dealing with issues in Spain).  Thanks.

-----Original Message-----
From: Grube, Raimund
Sent: Friday, December 07, 2007 11:21 AM
To: Wah, Linda; Daul, Ty
Cc: Hudgens, Terry
Subject: Re: Meeting in Radnor

Thank you Linda.  We are making arrangements to arrive the evening of the 17th.  Is it
safe to assume we will not need to stay for meetings on the 19th?  I am scheduled to meet
with the team in Boulder that afternoon but could reschedule if necessary.

Raimund

-----Original Message-----
From: Wah, Linda
To: Daul, Ty; Grube, Raimund
CC: Hudgens, Terry
Sent: Fri Dec 07 10:20:58 2007
Subject: Meeting in Radnor

Hi Ty and Raimund,


As a follow-up, Alvaro would like to schedule a meeting with you on Tuesday, Dec 18th in
Radnor.  Can you please make travel plans to be there on that date?  I don't have a
specific time but perhaps you can also plan to do other business while you are there.


I will also be joining you.  At this point, I don't know the process but will keep you
apprised if there is any clarity over the next week.  Thanks.




1

**Daul, Ty**

| | |
|---|---|
| From: | Grube, Raimund |
| Sent: | Monday, December 17, 2007 6:50 PM |
| To: | Wah, Linda; Daul, Ty |
| Subject: | RE: Tomorrow's meeting |

Thank you Linda. We will be in by 10AM and will be working from the hotel before then.


Raimund


**From:** Wah, Linda
**Sent:** Monday, December 17, 2007 5:22 PM
**To:** Grube, Raimund; Daul, Ty
**Subject:** Tomorrow's meeting

Hi Ty and Raimund,

For tomorrow's meeting, Alvaro, Belen and I would like to meet with you at 10:00 a.m. in the large conference room.  Please come prepared to discuss the following:

- whether you are committed to/interested in continuing your employment with Iberdrola USA
- what you would like the company to change in order for you want to continue your employment with the company (both financial and non-financial)
- what caused you to submit notice of your resignation
- any proposal you might have in order to reach mutually agreeable terms with the company.  For this purpose, you should presume that the company is going to dispute the fact that you have triggered severance provisions and is not willing to spend any more than what you have in terms of your compensation package.  If you are not prepared to provide a specific proposal, you could discuss what elements are important to you in your pay package (such as the bonus certainty you mentioned), or you might provide a couple different scenarios (if you were to continue and if you were to resign).

The company is still interested in retaining you but they have not heard any compelling reasons why we should negotiate different terms than what you already have.  You should spend this meeting getting the company to understand why you believe you need to leave the company or what it would take to motivate you to stay.

Please call me on my cell phone if you have any questions.  Thanks.

(503) 805 5157

1/8/2008

Daul, Ty

| | |
|---|---|
| From: | Wah, Linda |
| Sent: | Wednesday, December 26, 2007 2:35 AM |
| To: | Daul, Ty; Grube, Raimund |
| Subject: | Unsolicited advice |

Hi, you can take or leave this counsel but I thought you should know that Alvaro is not
the decision maker on the non-compete issue and that. Xabier feels strongly about it.  I
would suggest you focus on the payment terms and perhaps a Theo-like reduction in scope to
the non-compete rather than duration.  Also, the more you focus on non-compete the more
suspicious they become re: your commitment to stay.

As I said, just thought you should know the negotiating boundaries and dynamics.  Please
delete this email.

Hope you had great holidays.

1



WILLIAM T. PATTON
503.778.2015
pattonw@lanepowell.com

November 17, 2008

**VIA HAND DELIVERY**

The Honorable John V. Acosta
United States Magistrate Judge
U.S. District Court for the District of Oregon
Mark O. Hatfield U.S. Courthouse
1000 SW Third Avenue
Portland, OR  97204-2902

Re:    *Daul and Grube v. PPM Energy, Inc., now known as Iberdrola Renewables, Inc.*
       US District Court for Oregon, Case No. CV 08-524 AC

Dear Judge Acosta:

This letter responds to plaintiffs' letter of November 12, 2008, regarding this matter.

1.    **Documents.**

Plaintiffs devote most of their letter to discussing their request for communications between Iberdrola employees in Spain.  As PPM has previously indicated, it will produce documents reflecting non-privileged communications among Iberdrola and PPM employees in Spain, Portland, and Pennsylvania (where Mr. Mugica is based) regarding plaintiffs' claims.  The process of searching for these documents (including e-mails) in these three locations has taken longer than PPM's counsel originally anticipated.  PPM's counsel will be receiving documents from Spain and Mr. Mugica this week.  To the extent that there are any non-privileged documents that have not already been produced, PPM will produce them to plaintiffs by November 24, 2008.  PPM will also produce a privilege log by that date.

2.    **Protective Order.**

As this Court knows, plaintiffs have refused to agree to a protective order governing the production of documents in this case.  The court held a telephone conference on this issue and ordered that PPM produce to plaintiffs the documents which it deemed confidential and which should be subject to a protective order.  PPM did so, producing 72 pages marked "Confidential."  Plaintiffs have indicated that they do not believe any of the documents produced by PPM are confidential.

At this point, PPM renews its request that the Court enter a protective order in this matter. PPM's proposed protective order is attached hereto as Exhibit A.  This proposed order is

www.lanepowell.com

T. 503.778.2100
F. 503.778.2200

A PROFESSIONAL CORPORATION

601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON
97204-3158

LAW OFFICES

ANCHORAGE, AK . OLYMPIA, WA
PORTLAND, OR . SEATTLE, WA
LONDON, ENGLAND

The Honorable John V. Acosta
November 17, 2008
Page 2

similar to the protective that the Court entered in *Tinn v. EMM Labs, Inc.,* CV-07-963 AC (D. Or. 2008).

PPM has a compelling justification for requesting this order. When plaintiffs began their employment with PPM, they each signed a Confidentiality, Noncompetition and Nonsolicitation Agreement (the "Confidentiality Agreement"). Each of these agreements are attached as Exhibit B. In these Confidentiality Agreements, plaintiffs agreed to the following:

> 1.    **Confidentiality.** I acknowledge that in the course of my employment I have or will have access to proprietary information, trade secrets, and other information treated by [PPM] and its parent company and affiliates (collectively referred to as "Employer") as confidential, that such information is a valuable asset of Employer and that its disclosure or unauthorized use will cause Employer irreparable harm. As used in this Agreement, the term "Confidential Information" includes, without limitation,: (a) proprietary information of Employer; (b) *information marked or designated by Employer as confidential;* (c) information that is known to me to be treated by Employer as confidential; . . . and (e) information that derives or maintains value because it is not publicly known. Confidential Information also includes, without limitation, trade secrets as defined under the Uniform Trade Secrets Act, *information relating to Employer's business strategies,* pricing, customers, technology, products, costs, *employee compensation,* marketing plans, computer programs or systems, inventions and developments of every kind and character. I agree that I will not disclose any Confidential Information to any person, agency or court . . .

> 2.    **Agreement Not to Discuss PPM Matters.** I acknowledge and understand that my knowledge of Employer's business, its relationships or prospective relationships with other businesses or entities, and information about Employer's business strategies could benefit others and harm Employer. Consequently, *I agree not to discuss nor provide information to any third party or unauthorized person about PPM's business strategies, its executives or board of directors, and their thinking about business strategies, without the express written consent of the President of PPM.*

Ex. B at 1, 3 (italics added). The crux of plaintiffs' complaint in this matter is that certain business strategies adopted by PPM after the change in control adversely impacted plaintiffs' compensation. First Amended Complaint ¶¶ 17-19. Thus, many of the documents in the administrative record relate directly to "PPM's business strategies, its executives or board of directors, and their thinking about business strategies" and employee compensation— information which plaintiffs have expressly agreed to keep confidential.

The Honorable John V. Acosta
November 17, 2008
Page 3

The confidential memorandum prepared by Linda Wah, which plaintiffs have attached to their November 12, 2008, letter to the Court, is a good example of this. In that memorandum, Ms. Wah discusses "this year's business plans," and the business risks associated with plaintiffs' desires to leave the company. She also discusses compensation issues in detail. Ms. Wah designated this memorandum confidential when she prepared it in November 2007, and so did PPM when it recently produced it to plaintiffs.

The Court should enter PPM's requested protective order because it is plainly needed in order to protect PPM's contractual rights vis-à-vis the Confidentiality Agreements. Indeed, plaintiffs have already shown a willingness to disregard their contractual obligations by attaching Ms. Wah's confidential memorandum to their letter to the Court.

Moreover, plaintiffs have not articulated how they are prejudiced if the Court enters PPM's proposed protective order. The order would not prevent them from using any confidential information in this matter, provided they comply with the reasonable requirements of the order (such as filing documents under seal). The order also would not prevent plaintiffs from challenging a confidential designation if they feel the information is not covered by their Confidentiality Agreements or otherwise protected. Finally, the proposed protective order will enable plaintiffs to use information subject to their Confidentiality Agreements without breaching those agreements.

Accordingly, for the reasons set forth above, PPM respectfully requests that the Court enter the protective order which is attached hereto as Exhibit A.

3.    **Employment Agreements**

Plaintiffs are not entitled to the employment agreements of Linda Wah, Terry Hudgens, Martin Mugica, Xabier Viteri, and Alvaro Delgado.

First, contrary to plaintiffs' assertion, conflict of interest evidence is irrelevant even if the standard of review is de novo. In *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154 (9th Cir. 2001), the court stated as follows: "Because we hold that de novo review applies, we need not address Grosz-Salomon's contention that she should have been allowed further discovery to show a conflict of interest, since the point of showing a conflict of interest is to obtain a more demanding standard of review than abuse of discretion." *Id.* at 1162 n.34; *Leick v. Hartford Life and Acc. Ins. Co.*, 2007 WL 1847635 (E.D. Cal. 2007) (same).

Second, assuming that the standard of review is abuse of discretion, plaintiffs' have not made a threshold showing that the administrator's decision was tainted by the structural conflict of interest. The mere fact that Ms. Wah was considering various options in response to plaintiffs' claims (allowing the claims, denying the claims, or negotiating with plaintiffs) is not evidence of a conflict of interest.

The Honorable John V. Acosta
November 17, 2008
Page 4

Third, the Spanish law which may prevent disclosure of employment agreements by Iberdrola is the "Organic Law 15/1999, of 13th of December, on Personal Data Protection."

4.    **The Standard of Review Should be Decided Before Addressing Further Discovery.**

Plaintiffs indicate in their letter that they want to take the depositions of various PPM and Iberdrola employees.  Like their request for the employment agreements, any request for depositions is premature at this point.

As PPM has previously noted, the extent to which any discovery is permitted beyond the administrative record is dictated by the standard of review.  If the abuse of discretion standard applies, then discovery is limited to information that the administrator had before it. *Bendixen v. Standard Ins. Co.,* 185 F.3d 929, 944 (9th Cir. 1999).

If the standard of review is de novo, the Court in its discretion may allow very limited discovery beyond the administrative record.  As the court explained in *Silver v. Executive Car Leasing Long-Term Disability Plan,* 466 F.3d 727 (9th Cir. 2006): "The Ninth Circuit 'permits the district court *in its discretion* to allow evidence that was not before the plan administrator,' but we have advised that '[t]he district court should exercise its discretion ... only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision.'" *Id.* at 731 n.2 (quoting *Mongeluzo v. Travenol LTD Benefit Plan,* 46 F.3d 938, 944 (9th Cir. 1995)) (italics in original).

PPM understands that the reason for the court's telephone conference tomorrow is to establish a briefing schedule for the standard of review issue.  Once that issue is resolved, the parties can discuss what, if any, discovery is warranted beyond the administrative record.

Very truly yours,

William T. Patton

Enclosures
cc (w/encs):    Steven Larson, Esq. (via hand delivery)
                Robert E. Maloney, Jr., Esq.

708560.0002/750191.1

**Robert E. Maloney, Jr.**, OSB No. 67085
maloneyr@lanepowell.com
**Paul M. Ostroff**, OSB No. 95473
ostroffp@lanepowell.com
**William T. Patton**, OSB No. 97364
pattonw@lanepowell.com
**LANE POWELL** PC
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204-3158
Telephone: 503.778.2100
Facsimile: 503.778.2200

Attorneys for Defendant PPM Energy, Inc.,
now known as Iberdrola Renewables, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **TY DAUL and RAIMUND GRUBE,** | CV No. 3:08-CV-524-AC |
| Plaintiffs, | **PROTECTIVE ORDER** |
| v. | |
| **PPM ENERGY, INC., now known as IBERDROLA RENEWABLES, INC., and the CHANGE IN CONTROL SEVERANCE ENHANCEMENTS FOR KEY PPM EMPLOYEES PLAN,** | |
| Defendants. | |

Plaintiffs have requested, or stated that they will request, the production of documents
and/or information that defendant PPM Energy, Inc., now known as Iberdrola Renewables, Inc.
("PPM") considers to be or contain confidential information, proprietary information, or trade
secrets under applicable state law, and that are subject to protection under Federal Rule of Civil
Procedure 26(c)(7) and *Foltz v. State Farm Mutual Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003). The

PAGE 1 -  PROTECTIVE ORDER

EXHIBIT _A_
PAGE _1_

categories of information that are considered confidential and proprietary information are set forth with more particularity in paragraph 2 below.

Good cause exists to protect the confidential and proprietary nature of the information contained in documents, interrogatory responses, or deposition testimony, such that the entry of this Protective Order is warranted to protect against disclosure of such documents and information.

Based upon the above, and the Court being duly advised;

IT IS HEREBY ORDERED as follows:

1.  <u>Scope</u>.  This Confidentiality and Protective Order ("Protective Order") shall govern discovery in this action and shall be applicable to all information that has been or will be provided, produced, or obtained, whether formally or informally, in the course of discovery in this action, including, without limitation, information provided, produced, or obtained in or through any depositions, interrogatory response, response to a request for admission, and any document or thing provided or made available for inspection and/or copying (collectively "document, thing, or testimony").  As used herein, the term "document" shall include all forms of information delineated in Fed. R. Civ. P. 34(a).

2.  <u>Protected Information</u>.  Any person or entity, whether a party or a nonparty, and whether acting on its own or through counsel (hereafter "person"), which is participating in discovery in this action may designate any document, thing, or testimony CONFIDENTIAL (or words to that effect) so long as such person reasonably believes that such document, thing, or testimony contains or discloses, respectively, information justifying a CONFIDENTIAL designation.  CONFIDENTIAL Information is:

      a.      Proprietary information of PPM;

      b.      Trade secrets;

      c.      Information relating to PPM's business strategies, customers, or marketing plans;

PAGE 2 -   PROTECTIVE ORDER

EXHIBIT ___4___
PAGE ___2___

LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

708560.0002/748449.1

d.      Information relating to PPM's employees' compensation; and

e.      Proprietary business and financial information and any other information, the public disclosure of which is likely to have the effect of causing substantial harm to the competitive position of the person from which the information is obtained, or causing harm resulting from the disclosure of personal confidential information.

3.      <u>Procedure for Designating Documents</u>:   Any person desiring to subject the information contained or disclosed in any document (including, without limitation, any document response to a Rule 34 request or to a Rule 45 subpoena, answers to interrogatories and responses to requests for admission) delivered to or served on any party to the confidentiality provisions of this Protective Order must designate such document CONFIDENTIAL in the manner provided herein, unless the parties agree to an alternative procedure.   Any document delivered to or served on any party may be designated CONFIDENTIAL by affixing the legend "CONFIDENTIAL" to every page of the document.   All correspondence, legal memoranda, motion papers, pleadings and other written material which quote or disclose the substance of any CONFIDENTIAL Information must also be treated as such in accordance with the provisions of this Protective Order, and such documents must be marked in accordance with this paragraph.

4.      <u>Inadvertent Failure to Designate</u>.   If a party, through inadvertence, produces any CONFIDENTIAL Information without labeling or marking or otherwise designating it as such in accordance with the provisions of this Protective Order, the designating party may give written notice to the receiving party that the documents or things produced is deemed CONFIDENTIAL Information and should be treated as such in accordance with the provisions of this Protective Order.   The receiving party must treat such documents and things as CONFIDENTIAL Information from the date such notice is received.   Disclosure of such CONFIDENTIAL Information, prior to the receipt of such notice, to persons not authorized to receive CONFIDENTIAL Information will not be deemed a violation of this Protective Order; provided,

PAGE 3 -   PROTECTIVE ORDER

EXHIBIT   _A_
PAGE   _3_

LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

however, that the party making such disclosure shall notify the producing party in writing of all such unauthorized persons to whom such disclosure was made.

     5.    <u>Procedure for Designating Deposition Testimony</u>.  If any person believes that CONFIDENTIAL Information belonging to it has been or may be disclosed in the course of any deposition (whether through any question, answer, colloquy and/or exhibit), then such person may designate the deposition, portion thereof, or exhibit as CONFIDENTIAL by (a) stating on the record of the deposition that such deposition, portion thereof, or exhibit is CONFIDENTIAL, or by (b) stating in a writing served on counsel for the other party, or in the case of testimony given by a third party pursuant to a subpoena, up to thirty (30) days after receipt of such deposition transcript by the designating person that such deposition, portion thereof, or exhibit is CONFIDENTIAL.  All deposition transcripts and exhibits shall be treated as CONFIDENTIAL in accordance with the provisions of this Protective Order until written designation is made or the time within which to make such written designation has expired.   Where a claim of confidentiality is made at any deposition, all persons in attendance who, by virtue of the terms of this Protective Order, do not have access to such CONFIDENTIAL Information will be excluded from attendance at the portion or portions of the deposition at which such CONFIDENTIAL Information will be or might be disclosed.  If any of the depositions, portions thereof, or exhibits are identified as CONFIDENTIAL, then all originals, copies, and synopses thereof must be marked in accordance with this Protective Order.

     6.    <u>Restrictions on Use and Disclosure of CONFIDENTIAL Information</u>.  All CONFIDENTIAL Information obtained on behalf of a party from any person through discovery in this lawsuit, and any summaries, abstracts, or indices thereof, may be used by the persons who receive such information ("Recipient") solely for the preparation and trial of this lawsuit (including appeals) and for no other purpose whatsoever.  Unless otherwise authorized by the designating person or ordered by this Court, Recipients may not make CONFIDENTIAL Information public, may not use CONFIDENTIAL Information in any other civil action, and

PAGE 4 -   PROTECTIVE ORDER

EXHIBIT ___*A*___
PAGE ___*4*___

may not disclose or divulge CONFIDENTIAL Information to anyone except as permitted in this Protective Order.

       7.    <u>Permitted Disclosure of CONFIDENTIAL Information</u>.  Any information which has been designated as CONFIDENTIAL Information in accordance with this Protective Order may be disclosed to:

       a.    Partners, members, shareholders, and associate attorneys of the law firms which are then of record for the party requesting the CONFIDENTIAL Information;

       b.    Any outside expert or consultant for each party; provided, however, that all such outside experts or consultant shall first have executed an Undertaking in the form of Exhibit 1 attached hereto, which Undertaking shall remain in the possession of counsel for the party which has retained such outside expert or consultant; and further provided that any such outside expert or consultant is not a direct or indirect competitor of defendant;

       c.    Language translators, if necessary;

       d.    Law clerks, paralegals, stenographic support, and clerical employees of the persons identified in paragraphs 9a through 9c hereof, whose functions require them to have access to the CONFIDENTIAL Information;

       e.    The officers, directors, or employees of the party producing the CONFIDENTIAL Information or of the person designating the CONFIDENTIAL Information;

       f.    With respect to any particular document designated as CONFIDENTIAL Information, any person who is named on the face of such document as having been its author or one of its recipients, or who appears from other documents or testimony to have been a recipient of such document;

       g.    The Court before which this case is pending, including court personnel who are authorized by the Judges and the Magistrate Judges of this District to review such information; and

PAGE 5 -  PROTECTIVE ORDER

EXHIBIT _A_
PAGE _5_

h.      Any stenographer or court reporter present in his or her official capacity at any hearing, deposition, or other proceeding in this case.

8.      Filing Under Seal.  Any paper, document, exhibit, or thing that contains or discloses CONFIDENTIAL Information that is to be filed or submitted with the Court shall be filed in a sealed envelope or other appropriate sealed container, prominently marked with the caption of the case and notation:

**CONFIDENTIAL**

Subject to Protective Order in:

TY DAUL and RAIMUND GRUBE
vs.
PPM ENERGY, INC., now known as
IBERDROLA RENEWABLES, INC. and the
CHANGE IN CONTROL SEVERANCE ENHANCEMENTS
FOR KEY PPM EMPLOYEES PLAN
Civil No. 3:08-CV-524-AC
United States District Court
District of Oregon
[Indication of Nature of Contents]

**TO BE OPENED ONLY AS DIRECTED BY THE COURT**

Such sealed envelope shall be opened and reviewed only be personnel authorized by this Court.

9.      Disclosure at Trial.  Disclosure of CONFIDENTIAL Information at trial shall otherwise be governed by further order of the Court.

10.     Designation Not Conclusive.  The designation of any document, thing, or testimony as CONFIDENTIAL is intended solely to facilitate preparation for trial, and the treatment of any document, thing, or testimony designated as such shall not be construed as an admission or an agreement that the designated document, thing, or testimony contains or discloses any trade secret or confidential information in contemplation of law.  No person shall be obligated to challenge the propriety of any such designation, and any failure to do so shall not preclude a subsequent attack on the propriety of any CONFIDENTIAL designation.

PAGE 6 -   PROTECTIVE ORDER

EXHIBIT _____ A _____
PAGE _____ 6 _____

11.   <u>Relief Available</u>.  In the event of a dispute with respect to the designation of any discovery material as CONFIDENTIAL Information, counsel shall endeavor in good faith to resolve their dispute on an informal basis before presenting the matter to the Court for resolution. In the event of such dispute, the designating party seeking to preserve the confidentiality of any such document must make the showing required by Federal Rule of Civil Procedure 26 and *Foltz v. State Farm Mutual Ins. Co., supra,* in order to maintain the secrecy of such document.  The designating party must further assess whether redaction is a viable alternative to complete non-disclosure.  Any party hereto may seek relief from, or modification of, this Protective Order, and may challenge the designation of any document, thing, or testimony as CONFIDENTIAL.

12.   <u>Procedure Upon Termination of Action</u>.  Within sixty (60) days of the final determination of this action, including all appeals, and unless otherwise agreed to in writing by counsel, each party shall (a) return any original documents and things constituting CONFIDENTIAL Information produced to a receiving party to the designating party, and (b) either certify in writing that the remaining copies of such documents and things have been destroyed or return them to the designating party, such election to be made by the designating party.  Notwithstanding the foregoing, the attorneys of record for each party may retain all pleadings, briefs, memoranda, motions, and other documents containing their work product which refer to or incorporate CONFIDENTIAL Information, and will continue to be bound by the terms of this Protective Order with respect to all such retained information.

13.   <u>Privileged Information</u>.  Nothing contained in this Protective Order may be construed to require production of CONFIDENTIAL Information that is privileged or otherwise protected from discovery.  If a party, through inadvertence, produces any document or information that it believes is immune from discovery pursuant to the attorney-client privilege and/or the work product privilege, such production will not be deemed a waiver of any privilege, and the producing party may give written notice to the receiving party that the document or information produced is deemed privileged and that return of the document or information is

PAGE 7 -  PROTECTIVE ORDER

EXHIBIT __A__
PAGE __7__

requested. Upon receipt of such written notice, the receiving party must immediately gather the original and all copies of the document or information of which the receiving party is aware and must immediately return the original and all such copies to the producing party. The return of the document(s) and/or information to the producing party will not preclude the receiving party from later moving the Court to compel production of the returned documents and/or information.

14.    <u>Continuing Order and Continuing Jurisdiction of This Court</u>. The terms of the Protective Order shall survive the final termination of this action with respect to all CONFIDENTIAL Information that is not or does not become known to the public. This Court will retain jurisdiction, following termination of this action, to adjudicate all disputes either between the parties hereto or between a party hereto and a third party relating to or arising out of this Protective Order.

15.    <u>Custody of CONFIDENTIAL Information</u>. Documents and things designated as containing CONFIDENTIAL Information and any copies or extracts thereof, will be retained in the custody of the attorneys of record during the pendency of this action, except as reasonably necessary to provide access to persons authorized under the provisions of this Protective Order.

16.    <u>Transmission of CONFIDENTIAL Information</u>. Nothing in this Protective Order prohibits the transmission or communication of CONFIDENTIAL Information by hand delivery; face-to-face conference; in sealed envelopes of containers via the mails or an established freight, delivery or messenger service; or by telephone, telegram, facsimile, e-mail, or other electronic transmission system if, under the circumstances, there is no reasonable likelihood that the transmission will be intercepted and misused.

IT IS SO ORDERED.

DATED this _____ day of _____, 2008.


_____
United States Magistrate Judge


PAGE 8 -   PROTECTIVE ORDER

EXHIBIT ___A___
PAGE ___8___

Submitted by:

Robert E. Maloney, Jr., OSB No. 67085
Paul M. Ostroff, OSB No. 95473
William T. Patton, OSB No. 97364
(503) 778-2100
of Attorneys for Defendant PPM Energy, Inc.
now known as Iberdrola Renewables, Inc.

PAGE 9 -   PROTECTIVE ORDER

EXHIBIT ___A___
PAGE _____9_____

708560.0002/748449.1

EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**TY DAUL and RAIMUND GRUBE,**                          CV No. 3:08-CV-524-AC

Plaintiffs,

**UNDERTAKING**

v.

**PPM ENERGY, INC., now known as
IBERDROLA RENEWABLES, INC., and
the CHANGE IN CONTROL SEVERANCE
ENHANCEMENTS FOR KEY PPM
EMPLOYEES PLAN,**

Defendants.

1.    My name is _____. I live at _____

_____.  I am employed as

(state position) _____ by (state name and address of

employer) _____

_____.

2.    I have read the Protective Order that has been entered in this case, and a copy of it

has been given to me.  I understand the provisions of this Order, and agree to comply with and to

be bound by its provisions.

3.    I declare under penalty of perjury under the laws of the state of Oregon that the

foregoing is true and correct.

Executed this ____ day of _____, 2008.

_____

PAGE 10 - PROTECTIVE ORDER

EXHIBIT ___A___
PAGE ___1O___

## CONFIDENTIALITY, NONCOMPETITION
## AND NONSOLICITATION AGREEMENT
### Ty P. Daul

In consideration of my employment and the pay and benefits provided to me pursuant to the offer dated November 19, 2001 (the "[Letter Agreement]"), I agree to the following terms:

1.    **Confidentiality.** I acknowledge that in the course of my employment I have or will have access to proprietary information, trade secrets, and other information treated by PacifiCorp Power Marketing ("PPM"), an Oregon corporation, and its parent company and affiliates (collectively referred to as "Employer") as confidential, that such information is a valuable asset of Employer and that its disclosure or unauthorized use will cause Employer irreparable harm.  As used in this Agreement, the term "Confidential Information" includes, without limitation,: (a) proprietary information of Employer; (b) information marked or designated by Employer as confidential; (c) information that is known to me to be treated by Employer as confidential; (d) information provided to Employer by third parties which Employer is obligated to keep confidential and (e) information that derives or maintains value because it is not publicly known.  Confidential Information also includes, without limitation, trade secrets as defined under the Uniform Trade Secrets Act, information relating to Employer's business strategies, pricing, customers, technology, products, costs, employee compensation, marketing plans, computer programs or systems, inventions and developments of every kind and character.  I agree that I will not disclose any Confidential Information to any person, agency or court unless compelled to do so pursuant to legal process (e.g., a summons or subpoena or as otherwise expressly required by law) and then only after providing the Employer with prior notice and a copy of the legal process, nor will I use such Confidential Information for my own benefit or that of any other person, corporation, government or other entity except as is required by law.  I agree that upon my separation from employment as an employee and completion of my service as a consultant (or earlier if requested by Employer), I will return to Employer all originals and copies of documents and other materials relating to Employer or containing or derived from Confidential Information that are in my possession or control, accompanied, if requested, by written certification signed by me and satisfactory to Employer to the effect that all such documents and materials have been returned.

2.    **Agreement Not to Discuss PPM Matters.** I acknowledge and understand that my knowledge of Employer's business, its relationships or prospective relationships with other businesses or entities, and information about Employer's business strategies could benefit others and harm Employer.  Consequently, I agree not to discuss nor provide information to any third party or unauthorized person about PPM's business strategies, its executives or board of directors, and their thinking about business strategies, without the express written consent of the President of PPM.

3.    **Noncompetition.** In order for Employer to protect its interests in the competitive use of any Confidential Information, I agree that Employer shall establish a minimum period of six (6) months and a maximum period of  one (1) year after my employment with Employer terminates during which time I will not, directly or indirectly, whether as officer, director, employee, stockholder, agent, partner, consultant, paid or unpaid advisor, work for, engage in, or have any interest in or connection with any business (including, without limitation, utilities, power producers, power marketers or power traders), agency, cooperative, governmental entity or publicly-owned energy provider within North America, which directly or indirectly competes with Employer's businesses or planned future businesses.  This noncompetition restriction is not applicable to ownership of not more than five percent of the stock of any publicly traded corporation.  I acknowledge and agree that the terms of this noncompetition provision are reasonable in Employer's competitive and specialized business.  If a court of competent jurisdiction holds that any portion of this paragraph is unenforceable, the maximum restrictions of time, scope of activities, and geographic area reasonable under the circumstances will be substituted for any such restrictions held unenforceable.

EXHIBIT  B          PPM 00125

PAGE  1

4.    **Non-Solicitation.** I agree that for a period of (2) two years after my employment with Employer terminates I will not directly or indirectly, call on or solicit, induce, entice or attempt to solicit any customer of Employer or solicit any person who is employed by Employer to leave employment with Employer or to work for any other person or company.

5.    **Disputes.** The rights and obligations under this Agreement shall in all respects be governed by the laws of the state of Oregon, as applicable, without regard to the choice of law rules. Venue in any legal action shall exist exclusively in state or federal courts in Oregon. The prevailing party in any such litigation will be entitled to recover all reasonable attorneys' fees and other expenses, including attorneys' fees and expenses in connection with any trial, appeal, or petition for review.

6.    **Injunctive Relief.** It is understood and agreed that money damages would not be a sufficient remedy for any breach of this Agreement by me and that Employer shall be entitled to specific performance and injunctive relief as remedies for any such breach. I understand that such remedies shall not be deemed to be the exclusive remedies in the event of my breach of this Agreement, but shall be in addition to all other remedies available at law or in equity to Employer.

7.    **Severability.** If any provision of this Agreement is or becomes unenforceable, all remaining provisions shall remain valid and enforceable.

_____          _____11/27/01_____
Ty P. Daul                                                    Date

---

### Sign and return this Agreement to:

**Lauren Tweedale**
**PacifiCorp Human Resources**
**825 NE Multnomah, Suite 1800**
**Portland, OR 97232**

---

PPM 00126

EXHIBIT    B
PAGE    2

## CONFIDENTIALITY, NONCOMPETITION
## AND NONSOLICITATION AGREEMENT

In consideration of my employment and the pay and benefits provided to me pursuant to the offer dated **March 13, 2002** (the "[Letter Agreement]"), I agree to the following terms:

1.    **Confidentiality**.  I acknowledge that in the course of my employment I have or will have access to proprietary information, trade secrets, and other information treated by PacifiCorp Power Marketing ("PPM"), an Oregon corporation, and its parent company and affiliates (collectively referred to as "Employer") as confidential, that such information is a valuable asset of Employer and that its disclosure or unauthorized use will cause Employer irreparable harm.  As used in this Agreement, the term "Confidential Information" includes, without limitation,: (a) proprietary information of Employer; (b) information marked or designated by Employer as confidential; (c) information that is known to me to be treated by Employer as confidential; (d) information provided to Employer by third parties which Employer is obligated to keep confidential and (e) information that derives or maintains value because it is not publicly known.  Confidential Information also includes, without limitation, trade secrets as defined under the Uniform Trade Secrets Act, information relating to Employer's business strategies, pricing, customers, technology, products, costs, employee compensation, marketing plans, computer programs or systems, inventions and developments of every kind and character.  I agree that I will not disclose any Confidential Information to any person, agency or court unless compelled to do so pursuant to legal process (e.g., a summons or subpoena or as otherwise expressly required by law) and then only after providing the Employer with prior notice and a copy of the legal process, nor will I use such Confidential Information for my own benefit or that of any other person, corporation, government or other entity except as is required by law.  I agree that upon my separation from employment as an employee and completion of my service as a consultant (or earlier if requested by Employer), I will return to Employer all originals and copies of documents and other materials relating to Employer or containing or derived from Confidential Information that are in my possession or control, accompanied, if requested, by written certification signed by me and satisfactory to Employer to the effect that all such documents and materials have been returned.

2.    **Agreement Not to Discuss PPM Matters**.  I acknowledge and understand that my knowledge of Employer's business, its relationships or prospective relationships with other businesses or entities, and information about Employer's business strategies could benefit others and harm Employer.  Consequently, I agree not to discuss nor provide information to any third party or unauthorized person about PPM's business strategies, its executives or board of directors, and their thinking about business strategies, without the express written consent of the President of PPM.

3.    **Noncompetition**.  In order for Employer to protect its interests in the competitive use of any Confidential Information, I agree that for a period of one (1) year after my employment with Employer terminates I will not, directly or indirectly, whether as officer, director, employee, stockholder, agent, partner, consultant, paid or unpaid advisor, work for, engage in, or have any interest in or connection with any business (including, without limitation, utilities, power producers, power marketers or power traders), agency, cooperative, governmental entity or publicly-owned energy provider within North America, which directly or indirectly competes with Employer's businesses or planned future businesses.  This noncompetition restriction is not applicable to ownership of not more than five percent of the stock of any publicly traded corporation.  I acknowledge and agree that the terms of this noncompetition provision are reasonable in Employer's competitive and specialized business.  If a court of competent jurisdiction holds that any portion of this paragraph is unenforceable, the maximum restrictions of time, scope of activities, and geographic area reasonable under the circumstances will be substituted for any such restrictions held unenforceable.

DRAFT: 3/13/2002 8:09 AM

**EXHIBIT** _B_

**PAGE** _3_

4.    <u>Non-Solicitation</u>.  I agree that for a period of (2) two years after my employment with Employer terminates I will not directly or indirectly, call on or solicit, induce, entice or attempt to solicit any customer of Employer or solicit any person who is employed by Employer to leave employment with Employer or to work for any other person or company.

5.    <u>Disputes</u>.  The rights and obligations under this Agreement shall in all respects be governed by the laws of the state of Oregon, as applicable, without regard to the choice of law rules. Venue in any legal action shall exist exclusively in state or federal courts in Oregon.  The prevailing party in any such litigation will be entitled to recover all reasonable attorneys' fees and other expenses, including attorneys' fees and expenses in connection with any trial, appeal, or petition for review.

6.    <u>Injunctive Relief</u>.  It is understood and agreed that money damages would not be a sufficient remedy for any breach of this Agreement by me and that Employer shall be entitled to specific performance and injunctive relief as remedies for any such breach.  I understand that such remedies shall not be deemed to be the exclusive remedies in the event of my breach of this Agreement, but shall be in addition to all other remedies available at law or in equity to Employer.

7.    <u>Severability</u>.  If any provision of this Agreement is or becomes unenforceable, all remaining provisions shall remain valid and enforceable.

Raimund Grube

3/17/02
Date

Sign and return this Agreement to:

**Leiann Stephenson**
**PacifiCorp Human Resources**
**825 NE Multnomah, Suite 1800**
**Portland, OR 97232**

PPM 00046

DRAFT: 3/13/2002 8:09 AM
EXHIBIT    B
PAGE    4